PENTHOUSE INTERNATIONAL, LTD. and Boardwalk Properties, Inc., Plaintiffs,

v.

DOMINION FEDERAL SAVINGS & LOAN ASSOCIATION and Melrod, Redman & Gartlan, P.C., Defendants.

DOMINION FEDERAL SAVINGS & LOAN ASSOCIATION, Third-Party Plaintiff,

v.

QUEEN CITY SAVINGS & LOAN ASSOCIATION, Third-Party Defendant.

No. 84 Civ. 4325 (KTD).

United States District Court, S.D. New York.

July 29, 1987.

As Amended July 30, 1987.

Shea & Gould, New York City, for plaintiffs; Milton S. Gould, Joseph Ferraro, Susan B. Ratner, of counsel.

Fine, Tofel, Saxl, Berelson & Barandes, P.C., New York City, for defendants and third-party plaintiff; Robert Tofel, Sherman Saxl, David B. Newman, of counsel.

Nitkin Alkalay Handler & Robbins, New York City, for third-party defendant; Peter C. Alkalay, of counsel.

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs, Penthouse International, Ltd. ("Penthouse") and Boardwalk Properties, Inc. ("BPI") (collectively "Penthouse") bring this action against the defendants Dominion Federal Savings and Loan Association ("Dominion") and Melrod, Redman and Gartlan, P.C. (the "Melrod firm") for breach of an agreement to loan plaintiffs $97 million for the construction of a casino and hotel in Atlantic City, New Jersey. Dominion as a third-party plaintiff claims that should it be found liable to the plaintiffs, the third-party defendant, Queen City Savings and Loan Association ("Queen City"), the lead lender on the transaction, must be found liable to Dominion.

The bench trial of this matter lasted three weeks, from May 11, 1987 until June 1, 1987. After consideration of the evidence and exhibits presented at trial, the following shall constitute my findings of fact and conclusions of law.

## FACTS

Prior to 1983 and in connection with the casino and hotel project, Penthouse assembled five adjoining parcels of land, in Atlantic City, New Jersey, three of which it owned in fee, and two of which it leased. The Boardwalk & Missouri Corporation ("BMC") pursuant to a lease dated March 1, 1978 and amended March 13, 1979 (the "Helmsley lease") leased property on which a Holiday Inn Hotel was located to Penthouse. The Four Seasons Hotel was located on the second parcel of land assigned and leased to Penthouse by the Rothenbergs (the "Rothenberg lease"). Joint Pre-Trial Order ("PTO") ¶¶ 8–10.

Although Penthouse spent more than $60 million before 1983 in preparation for the proposed casino and hotel, they had experi-

enced difficulty in obtaining financing for the completion of the project. PTO ¶¶ 11–12.

On about June 20, 1983 Queen City issued a written Mortgage Loan Commitment (the "Loan Commitment") to Penthouse in the amount of $97 million. PTO ¶ 14. Penthouse accepted the loan offer on June 29, 1983. PTO ¶ 14. Pursuant to the Loan Commitment, Queen City was to be lead lender and was to lend $7 million on the loan while Penthouse was to procure additional participating underwriters for the loan. PTO Exh. A, Tr. 51. There were twenty additional conditions attached to the Loan Commitment.

In the spring of 1983, Jack Burke ("Burke"), a mortgage broker brought into the deal by Jefferson National Mortgage Company ("Jefferson National") to assist Penthouse in obtaining loan participants, along with other brokers, presented the possibility of participating in the Queen City loan to various officers of Dominion. Tr. 143. In June, 1983 certain mortgage brokers also brought the mortgage loan to the attention of Community Savings and Loan Association ("Community"), which decided not to become involved in the transaction at that time. PTO ¶ 15. Not until later did Community agree to participate in Dominion's part of the loan.

On November 21, 1983 a meeting was held at Penthouse's New York offices. In attendance were: David Myerson ("Myerson") the Executive Vice President of Penthouse and BPI; Marc Bendesky ("Bendesky") Penthouse's Director of Special Projects; Arthur Panero ("Panero") a Consultant to Penthouse and BPI; Jay Newman ("Newman") a member of the Lefrak, Fisher and Myerson law firm (the "Lefrak firm") and counsel to Penthouse; John Beahan ("Beahan") the Senior Vice President of Queen City; Charles Filippo ("Filippo") of Queen City; John Lipari ("Lipari") counsel to Queen City; David Neal ("Neal") President of Dominion; Burke; Stephen Gavula ("Gavula") President of Epic, a mortgage brokerage company affiliated with Community, tr. 144; William Dorn ("Dorn") counsel to Dominion prior to

the Melrod firm; Robert Geiger ("Geiger") Chairman of Jefferson National; and others. PTO ¶ 17.

At this meeting several documents were signed, PTO ¶¶ 19–20, and Dominion agreed to participate in the loan to the extent of $35 million, the amount not yet participated out. PTO ¶¶ 18–19. In form, Dominion's undertaking was absolute although Dominion planned to sell part of its participation to Community and to others. Tr. 779.

In light of Dominion's commitment, Queen City notified Penthouse that it had met condition number 19 of the Loan Commitment and that there were sufficient participants to provide the $97 million loan amount. PTO ¶ 22.

Because Dominion's legal lending limit was only $18.5 million, tr. 821, it had, by the November 21 meeting, obtained a "handshake" agreement with Community whereby Community had agreed to purchase one-half of Dominion's participation. Tr. 844–845, Neal Deposition, 88. The agreement between Dominion and Community was finalized in writing on December 2, 1983. PTO ¶ 23.

From December 1983 through February 1984, Dominion attempted, on behalf of itself and Community, to sell further participations in its $35 million commitment, with no success. Tr. 350, 846–847. Dominion's Chairman of the Board, William Walde ("Walde"), testified that because of the difficulties Dominion was experiencing in trying to sell the loan, it felt it was "losing some credibility" in the market. Tr. 848.

After the $97 million was fully and finally committed, representatives of Penthouse and Queen City met on several occasions to review the status of the loan and to move it toward closing. Two status conferences were held on January 5 and January 16, 1984 for that purpose. Tr. 431, 487–488. No representatives of Dominion were in attendance at either status conference, nor did Dominion request that anyone be present. Indeed, no participant other than Queen City, the lead lender, had any representative present. Each participating bank

had committed itself to be a part of the Queen City package, each had accepted the conditions of the Queen City Commitment, each had accepted Queen City as the lead lender and none had requested any separate condition. It is clear, at least until the intervention of Phillip Gorelick, Esq. ("Gorelick"), that no participating bank had sought to become involved in reviewing the Queen City commitment conditions, leaving that solely to the lead lender and its counsel. At the meetings, Lipari reviewed each condition and discussed its status at the time.

These meetings were conducted in an attempt to resolve problems so that all the participating banks could attend a preclosing meeting and a closing of the entire loan at which the first advance would be made. The preclosing meeting was actually held on February 9, 1984 and will be discussed in detail below.

At the January 5 meeting, condition 16, requiring Penthouse to submit its architect's and construction contracts to Queen City for its review was discussed. Tr. 438, Plaintiff's Exh. 17. On January 5, Penthouse did not have an architect's contract in place, however, Panero explained that Penthouse had had architects prepare plans in 1978 and 1979 and that it preferred to proceed, at this point, with the engineer, DeSimone, rather than hiring another architect. It was explained that DeSimone would be capable of preparing or obtaining any additional drawings which might be necessary. Tr. 439, 544–545. DeSimone further explained that completed architectural plans were not generally provided in Atlantic City projects. Tr. 545. He noted that revisions would have to be made periodically to comply with changing building codes. Tr. 545. This arrangement was deemed sufficient by the lead lender. Tr. 439, 545.

Condition 16 further required that copies of contracts with the project manager and major trade contractors be submitted to Queen City for its approval. PTO Exh. A. The contract with Sodeteg, a French corporation hired to be the project manager ("Sodeteg"), had been negotiated a year earlier,

tr. 543, and was in place on the date of the preclosing meeting, February 9, 1984. Tr. 439, 542–543, Plaintiff's Exh. 52.

Also, at the January 5 meeting, a representative of Sodeteg explained that it would not seek construction bids for other than the cement work until after the loan closed. Tr. 440–441, 493–494, Plaintiff's Exh. 17. Sodeteg explained that it would take bids from subcontractors instead of hiring a general contractor. Tr. 441. At the time of the status conferences, Sodeteg was involved in negotiations with a local construction manager it planned to hire to assist in selecting the various trade contractors. Tr. 545. Again, Lipari agreed to this procedure and Queen City's right to approve the contracts was agreed to be a continuing right. Tr. 441–442, 494, Plaintiff's Exh. 17. The agreement constituted a waiver of condition 16 which literally required that the major trade contractors' contracts be approved before the loan closing.

With respect to condition 12, which required that Penthouse deliver to Queen City an architect's certification containing final plans and specifications and a statement of full compliance with local, state, and federal ordinances and regulations, it was agreed that Queen City would accept the engineer's certification in place of an architect's certification. Tr. 439, 491–492, 545–547. The plans and specifications, as well as the certification, were subject to the approval of Queen City's architect, Bob Rasmussen ("Rasmussen"). Tr. 442–444. Thus, condition 16 was waived to the extent that it required Penthouse to submit an architect's contract to Queen City for its approval. Moreover, the requirement that Penthouse submit an architect's certification was modified, so that submission of an engineer's certification was to be adequate compliance.

Condition 11, which required the lead lender's written approval of the plans and specifications for improvements, was also waived at the status conferences to permit Penthouse unilaterally to make changes not exceeding $100,000 for each change, or $2 million in total. Although the plans and

specifications had been prepared several years before, the representatives of the lead lender agreed to accept them as fulfilling the condition, subject to necessary revisions. Thus, the plans and specifications were in place on the date of the preclosing meeting. Tr. 442–443, 492–493. Rasmussen, Queen City's architect, had reported that the plans were acceptable but not entirely complete and would require a few changes in the future to ensure compliance with particular building codes. Tr. 442–443. Queen City indicated its acceptance of this procedure as long as Rasmussen was satisfied with the changes. Tr. 444. Lipari testified that the revisions to the plans and specifications were not required prior to closing. Tr. 493.

The project budget, required by condition 13, was discussed and was in place by the preclosing date. Tr. 275, 444.

Myerson also covered the status of the casino licensing proceedings before the Casino Control Commission (the "Commission"). Tr. 450. Although the proceedings had been temporarily suspended at Penthouse's request, tr. 285, they were to resume after the closing, tr. 285, and it appeared an arrangement with the Commission was easily within reach. Tr. 453–455.

Condition 10 required Penthouse to submit to Queen City copies of agreements providing for utility services to the casino and hotel. Plaintiff's Exh. 17. By the January 5 meeting, Penthouse had agreements with the suppliers of electricity, telephone, gas, and sewage services and had an agreement from the Atlantic City Municipal Utilities Authority. Plaintiff's Exh. 17. Lipari testified that he had agreed that the loan could proceed to closing on the basis of these agreements. Tr. 494. Thus, to the extent condition 10 could be interpreted as requiring anything more, it was waived.

Also during the status meetings and later, Lipari and Newman discussed the status of the title reports from Commonwealth Title. Tr. 495–496. Title searches on the property covered by the Helmsley lease revealed prior encumbrances and it was determined that Helmsley's consent would be needed in order to give Queen City and the other lenders a first leasehold mortgage. Tr. 496. Moreover, Helmsley would also be required to release certain declarations of easements to permit their subordination to Queen City. Tr. 497, 548. Although the title questions were unresolved on the date of the preclosing meeting, tr. 497, discussions had been initiated between Penthouse and Helmsley for resolving these matters. Tr. 549–551. Moreover, it is clear that the entire matter could have been resolved in time to close the deal before March 1, 1984.

In December 1983, however, Community hired a new underwriter who apparently decided to underwrite the Penthouse loan after it had already become a participant. Wienke Deposition, 24. Generally, underwriting is done before a commitment is entered into, and even Dominion's Chairman of the Board, Walde, admitted that underwriting a loan subsequent to a commitment is simply bad banking practice, tr. 798–799, and in some cases can be a breach of contract.

In various internal meetings during December 1983 and January 1984, the new underwriter, Wienke, began to express a very negative view of the Penthouse loan. Wienke Deposition, 35–45. Whether Wienke's dissatisfaction was conveyed to Dominion is irrelevant, but it was not conveyed to the plaintiffs or to Queen City.

In early February 1984, Geiger, the original Penthouse broker, received a phone call from Gavula, a broker acting on behalf of Community, who requested that Geiger attend a meeting in Washington, D.C. The meeting took place on February 7, 1984 at Tiberios restaurant, only two days before the scheduled preclosing meeting. PTO ¶ 26. In addition to the brokers, representatives of Dominion, Community and Queen City were there. PTO ¶ 26. At this meeting, and in front of Neal and other Dominion representatives, Wienke stated that Community was opposed to hotel and casino loans for moral reasons. Tr. 148–150, 346–347. He further demanded to be provided with a long list of documentation not required by the Loan Commitment. Tr.

148, 346–347. Geiger objected to Community's attempts to underwrite the loan after the Commitment was in place. Tr. 347. Neal, however, stated that it was important to Dominion that Community receive the information it requested, tr. 149, because Dominion had to sell participations in the secondary market. Tr. 347. The meeting was adjourned until the next day, February 8, 1984, at Dominion's offices in Virginia. PTO ¶ 27.

Walde, the only officer from Dominion to testify in person at the trial, claimed that he did not attend the meeting on February 8, 1984, tr. 863, and that no one indicated to him that Community had expressed any problems with the loan or a desire to withdraw. Tr. 912. Other evidence, however, indicates that he did participate, at least sporadically, in that meeting and that he knew of Community's participation problems as of that date.

Even if Walde personally had no knowledge of Community's waivering participation, other officers of Dominion were fully aware of it. By letter dated February 3, 1984, Wienke requested a three page list of information from Bray, Dominion's Vice President, much of which was not required by the Loan Commitment. Joint Exh. 3. Wienke began by stating, "it is not possible at this time to reach a conclusion on the participation" and concluded the letter by stating "[o]nce we are in receipt of the above information we will commence our analysis promptly." Joint Exh. 3. Thus, Dominion should have been aware of Community's tenuous status as a loan participant by February 3, 1984 and certainly Dominion was aware by the Tiberios meeting. In fact, on its Commitment Participation Report for February, Dominion dropped Penthouse as a listed borrower. Tr. 900–906. I view this as almost conclusive proof that Dominion's officers had de-cided to breach its commitment by that time. Recognizing the potential liability they were incurring, Walde and his underlings sought a coverup. In this plot they found a willing tool in Gorelick.

Geiger testified that at the Tiberios meeting Wienke requested information about the cement, parking and other issues, which angered Geiger. When he stated that Dominion was not acting in good faith by underwriting the deal after its commitment, tr. 349–350, Walde replied "Screw good faith. We're going to do it our way because we're the co-leader." Tr. 349–350. Walde thereafter announced that Dominion was hiring new legal counsel, Gorelick, to handle the transaction for them. Tr. 349, 387. Moreover, Neal also stated that Dominion's secondary market people had questions they wanted answered, tr. 350, or the deal would not close. Tr. 390–391.

On February 8, Neal called Gorelick and asked him to attend the preclosing meeting in New York the following day. Tr. 916–917. Gorelick then met with Neal, Bray, and Walde for about three hours. Tr. 918. Gorelick testified that Neal and Bray gave him numerous documents to review and asked him to assist in closing the loan for them. Tr. 918–919. He further claimed that they told him Community was a fifty percent participant with Dominion and that he was to copy Wienke on everything he did in reference to the loan. Tr. 1037. Gorelick claims, however, that neither Neal nor Bray told him anything about the February 7 or 8 meetings or about the problems they were experiencing with Community. Tr. 1035–1038. Gorelick's testimony is totally incredible.[1] Moreover, it is contradicted by Neal who stated that he believed he had given Gorelick a copy of Wienke's February 3 letter. Neal Deposition, 222. The inferences to be drawn from

---

1. The decision as to the credibility of witnesses is properly left to the trial judge or to the jury because as finders of fact they are in a position to view the demeanor of the witnesses.

Gorelick took the stand and attempted brazenly to lie to the court. During cross-examination, the crucible of truth, Gorelick continuously shifted uneasily in the chair, sweated like a trapped liar, and the glaze that came over his shifty eyes gave proof to his continuing perjury. His total lack of veracity was shown not only by his demeanor but by the shady practices he seemingly reveled in. He charged needless and exorbitant fees, Joint Exh. 41, for work that was intentionally unproductive. While representing the bank he demanded a $150,000 "bonus" from the borrower if the loan closed, an arrangement Gorelick never disclosed to his bank-client.

Gorelick's outrageous perjury are often the exact opposite of what he said. In particular, I make the finding that Dominion hired Gorelick to bully and intimidate the plaintiffs into delaying the loan until Community could be replaced or failing that, to delay until the Commitment expired and Dominion was released from its obligation.

The preclosing meeting was held the following day, February 9, 1984, at Penthouse's headquarters in New York. Tr. 498.

On the morning of February 9, the preclosing meeting began uneventfully. After Panero presented a display model of how the completed casino would look, tr. 552–553, Lipari distributed all the documents relevant to the loan transaction and went through each condition of the Loan Commitment discussing its status. Tr. 193, 498–499, 553. Thereafter, however, things rapidly fell apart. Although Gorelick's attendance during the meeting was sporadic, tr. 499, he indicated that he had comments to make and would do so after the morning session. Tr. 500. At the meeting Gorelick insisted on meeting with Myerson and Newman outside the hearing of the others.

Gorelick stated there were numerous problems with the loan, tr. 223, 502, that he would have expected to have seen additional documentation, tr. 503, and that the documents already prepared were "idiotic", inadequate and poorly drafted. Tr. 503, 554, 1047. Gorelick's objections were directed more to the form of the documents than to their substance. When confronted by Lipari about his specific objections to the documents, Gorelick replied that they were not prepared the way he would have done them and that the mortgage should have been twenty to thirty pages in length. Tr. 353, 360–361. Gorelick then presented a lengthy list of documents and other items he wanted to see before he would recommend that his client close the deal. Tr. 223, 553–554. Gorelick expressed more concern with Dominion's ability to "participate out" its share of the Loan Commitment, tr. 365, than with closing the deal.

After hearing of Gorelick's complaints, Myerson was asked to assist at the preclos-

ing meeting. Tr. 222, 225. Myerson then spoke with Gorelick in the hallway. Myerson stated that Gorelick "strenuously objected" to Lipari's papers, tr. 223, 225, and stated there would be no deal unless Gorelick took over and prepared the documents. Tr. 226. Moreover, Myerson's impression was that Gorelick objected to everything and that "everything presented was unacceptable" and had to be redone. Tr. 308–309. In his examination before trial, Gorelick tellingly stated that the loan was not "in a position to close at any time." Tr. 1047.

Feeling that cooperation with Gorelick was the only way to save the deal, Myerson asked Lipari to work with Gorelick by letting the Melrod firm prepare and review documents subject still to Lipari's ultimate approval. Tr. 310, 504–505.

Gorelick and Lipari then had a conversation in which Lipari testified that Gorelick was "abusive" and demeaning of Lipari's abilities. Tr. 505–506. When Lipari asked Gorelick how long it would take him to redraft the documents, Gorelick was unresponsive. Tr. 506. Finally Gorelick replied that he did not know if thirty additional days would be sufficient. Tr. 506.

Gorelick also spoke to Newman and told him that the loan would close only if Newman withdrew as counsel for Penthouse and was replaced by an attorney from Washington, D.C. Tr. 555.

I do not find it necessary to rule directly on Gorelick's expertise, or lack thereof, in the field of real estate law. It is sufficient to say that the amount of learning and knowledge he and his partners displayed in this transaction was far from impressive. Even the expert called by the defendant disputed much of what Gorelick said.

The overwhelming evidence shows that Gorelick's demands were equal to a demand that the deal be completely done over, notwithstanding the fact that everyone in attendance at the preclosing meeting realized that the parties were still doing a number of things to prepare the deal for closing. At the time, there was simply no basis for not believing that the outstanding matters could be dealt with and the deal

closed on schedule. Taken in context, Gorelick's actions at the preclosing meeting and afterwards establish his deliberate efforts to sabotage the deal. Myerson told Gorelick, when the parties reconvened in the conference room, that both Newman's firm and Lipari would assist him by providing all the documentation they could and by permitting Gorelick to prepare the loan documents to his satisfaction. Tr. 310, 556.

Before Gorelick would agree to do the additional work which he alone demanded to have done, he insisted on obligating someone to pay his fee. Tr. 229–230. He further told Myerson that he would "want to be paid for the trouble" of giving the case priority status. Tr. 948–949. He demanded specifically payment of both fees [2] and a $150,000 bonus. Tr. 232, 949. Under the circumstances, Penthouse had little recourse but to give in to this extortion and a written agreement dated February 10, 1984 was signed by Gorelick and Myerson. Joint Exh. 55.

Rather than resuscitate the deal, however, Gorelick brought about its demise. Gorelick testified that it was his firm's responsibility to prepare the closing documents. Tr. 1064, 1068. Nevertheless, the only documents prepared were rough drafts of the promissory note, mortgage and deed of trust. None of these documents was sent to anyone to review. Tr. 982–983, 1064. Gorelick's claim that he never completed the documents because he was waiting for additional, necessary information, tr. 1064–1065, is completely incredible. I have no doubt that he was in fact waiting, not for information, but for the deal to fall apart. Putting the documents aside with a view toward finalizing them later, tr. 1065, and refusing to prepare numerous other documents even preliminarily, tr. 1068–1071, is not consistent with working diligently on a high priority deal. Dominion's own expert testified that these documents could be prepared overnight or in a very short period of time. Tr. 1228–1229, 1330.

From the date of the preclosing meeting on, Gorelick became Dominion's hatchet man intent on destroying the deal. Yet, neither Penthouse, Queen City, nor any of the other participants knew the role he was playing. The very day Penthouse agreed to pay Gorelick's fees, Newman sent Gorelick a large box of documents responding to his demands. Joint Exh. 30. Numerous additional documents followed within days. Tr. 558, 953, 1075. Included were both the Helmsley and Rothenburg leases. Tr. 953. Gorelick and the Melrod firm thereafter made numerous requests for additional information. Tr. 559–560, 955, 1075, Joint Exhs. 31, 43, Plaintiff's Exh. 63.

After receiving these requests for voluminous information Newman spoke with Myerson. Tr. 564. Because of the nature of the requests Myerson and Newman called Gorelick and his partner, Louis Trotter ("Trotter"), on a conference call. Tr. 564–565. During the conversation Gorelick stated that everything on the list titled "Amendments Required to the Helmsley Lease", Plaintiff's Exh. 63, Joint Exh. 45, was absolutely essential to closing the loan. Tr. 565. Myerson told Gorelick and Trotter that many of their requests seemed unreasonable and unncessary. Tr. 235. Nevertheless, Gorelick was willing to compromise on only one request, the "shoring up" provision for the building. Tr. 565–566. Under questioning at trial, however, Gorelick admitted that much of the information he requested was *not* essential for closing the deal, nor required by the Loan Commitment. Tr. 943–946, 963–969, 1103–1114.

On February 29, Myerson flew to Washington, D.C. for meetings with Dominion and the Melrod firm. PTO ¶¶ 32, 33. The only thing Gorelick would report at the time was that he had prepared a revised checklist and had sent it to Newman. Gorelick stated that it would therefore be useless to discuss anything further at that time. Tr. 237. Myerson then went to Dominion's offices and met with representatives of both Dominion and Community.

---

**2.** The fees collected by Gorelick and the Melrod firm under the heading "For Professional Services" included eleven hours work at $55 per hour by Ms. Higgins, Gorelick's secretary. Tr. 1386.

Wienke stated that he believed there would necessarily be lengthy delays before the deal could close and gave Myerson a list, Joint Exh. 44, of items he felt he needed. Tr. 239–241. Community then decided to withdraw from the deal.

In another example of Gorelick's disregard for the oath he had taken to tell the truth, he denied at trial any awareness of Community's withdrawal from the deal until after this lawsuit began. His testimony is belied by others. Gorelick and Neal had a conversation with Wienke on February 29, 1984, in which Wienke expressed Community's desire to withdraw from the deal. Tr. 986–987, 1122–1123, 1125–1126. Gavula stated that he informed Neal of Community's withdrawal on that date, Gavula Deposition, 48–49, and one of Gorelick's partners testified that Gorelick told him, before this litigation, that Community was withdrawing. Tr. 1374–1375. Community's withdrawal, however, was kept secret from Penthouse and Queen City.

Soon after his return Myerson received a letter from Bray requesting even more information. Joint Exh. 59. Myerson thereafter contacted Robert Guccione ("Guccione") President of Penthouse, who held a meeting at his home on March 6, 1984 which both Walde and Myerson attended. Tr. 18–19. Walde complained that Queen City was a small, inconsequential bank and was ill-equipped to handle a transaction of this size. Tr. 19–20. Walde further stated that he wanted Queen City fired and Dominion to replace them as the lead bank. Tr. 20, 247–248. Although Walde expressly denied this, I do not believe him. Guccione responded that it would be fundamentally unfair and unethical to dismiss Queen City at this point in the deal, but that he would talk to Thomas Tracey ("Tracey") the Executive Vice President of Queen City and see if something could be done. Tr. 20–21, 248. Walde further told Guccione that he no longer had any concerns about Guccione's licensability. Tr. 22–23. Myerson also explained the plans for a management company to run the casino if there were any licensing problems. Tr. 248.

Guccione thereafter met with Tracey who was reluctant to give up Queen City's status as lead lender. Tr. 24, 26–27, 249–250.

On March 6, 1984 Guccione met with Walde, Gorelick and others of the Melrod firm in Washington, D.C. PTO ¶ 34. After lunch, Guccione and Walde met privately in Walde's office. Tr. 25–26. Guccione told Walde that Dominion could be a co-leader with Queen City and that he would pay Dominion for any fees they would lose by not being the exclusive lead lender. Tr. 26–28. Walde was not swayed by Guccione's observations that to remove Queen City from the deal would mean that Dominion would have to seek new participants for the over $60 million Queen City had already raised. Tr. 27–28, 248–249.

Throughout February and March, Dominion, through the Melrod firm, continued to make requests for more information which Newman accurately described as "never ending." Tr. 569. Dominion further demanded numerous changes in the way the entire deal was to be structured, the parties involved, and other changes not required by the Loan Commitment.

When Penthouse finally realized that Dominion was intentionally destroying the deal and would refuse to close, it sought to mitigate its damages by contacting Geiger and seeking a replacement for Dominion. Tr. 256–257. After numerous unsuccessful attempts to replace Dominion, Penthouse began seeking a buyer for the property. Tr. 257. Those efforts also failed. Penthouse now seeks damages from Dominion for breach of its participation agreement.

## DISCUSSION

Plaintiffs allege that Dominion's conduct amounted to an anticipatory repudiation of the Loan Commitment. Defendants argue that their behavior does not rise to the level of an unequivocal refusal to perform their contractual obligations. They further argue that Penthouse was not in a position to meet the conditions precedent to the loan closing, specifically conditions, 10, 11, 12, 13 and 16.

As to defendant's latter assertion, at the time of the preclosing meeting, all of the conditions precedent had been met, waived, or were in a position to have been met by the date set for closing the loan. All the participants were aware, at the preclosing meeting, that there were some minor title problems which needed to be straightened out and discussions with the title company and Helmsley were ongoing. Tr. 294–297, 496–497, 548–552. There was no reason to believe this would not or could not be resolved prior to the actual closing. Penthouse indicated its willingness to go to Helmsley for the necessary changes, even though they expected it to cost them a considerable sum of money. Tr. 295–296.

Condition 10 required that the lender be furnished with copies of the utilities contracts prior to closing. Lipari, as counsel to the lender, had waived condition 10 regarding utilities by agreeing during the status conferences to proceed without obtaining new utilities agreements. Tr. 494. Conditions 11 and 12 were also waived by Lipari to the extent that they required documentation beyond that agreed to at the status conferences. Tr. 442–444, 491–493.

Condition 13 required that a project budget be in place prior to closing. A draft of the project budget had been prepared by the last status conference, Plaintiff's Exh. 17, and Bendesky testified that there was a project budget in place by the preclosing meeting. Tr. 444. Thus, condition 13 had been met.

Condition 16 required the lender's approval of the architect's contract, the contract with the project manager and the major trade contractors. This condition was also waived by Lipari at the status conferences. Tr. 440–442, 492–493. Because these conditions had been met or waived, Dominion's argument to the contrary is totally unavailing.

While defendants are correct that merely threatening nonperformance under the contract would not rise to the level of an anticipatory breach, their conduct in this case far exceeded mere threats. Where a party to a contract indicates its refusal to perform unless entirely new or different conditions are first met, then it has breached the agreement. 4 Corbin on Contracts § 973 (1951); Restatement of the Law on Contracts § 250(b) (1981). New Jersey follows these basic contract principles.[3] *Ross Systems v. Linden Dari-Delite, Inc.*, 35 N.J. 329, 173 A.2d 258, 264 (N.J.Sup.Ct. 1961); *Seitz v. Mark–O–Lite Sign Contractors*, 210 N.J.Super. 646, 510 A.2d 319, 323 (N.J.Super Law Div.1986).

Defendant's pretense of willingness to proceed cannot mask its true intentions. Because of Community's withdrawal on February 29, Dominion was in the awkward position of having committed itself to lend more than the amount it was legally permitted to lend. While, as defendants argue, the mere commitment to lend in excess of this amount may not result in a violation of the Federal Home Loan Bank Board Regulations, it is nevertheless true, that actually lending the amount Dominion was committed to lend, would violate these regulations. Thus, Dominion either had to stall the closing until the loan expired and then withdraw from its commitment, or breach its agreement. In light of the circumstances, Dominion's representatives' conduct and statements amounted to a clear refusal to proceed to closing unless conditions beyond those required by the Loan Commitment were first met.

For example, during February and March 1984 Gorelick stubbornly proclaimed that everything on the list titled "Amendments Required to Helmsley Lease" was absolutely required, yet, he was forced to acknowledge this was not in fact true during cross-examination. Tr. 943–946, 963–969, 1103–1114.

Among the documents signed November 21, 1983 was letter from John Beahan ("Beahan") of Queen City which Myerson accepted on behalf of Penthouse, amending the Commitment to require that a hotel management agreement be entered into within nine months of the loan closing. PTO Exh. D. In spite of this condition, Dominion insisted that the agreement be

---

**3.** The parties do not dispute that New Jersey law applies in the instant case.

entered into prior to closing. Joint Exhs. 59, 61.

Although Penthouse had a long standing agreement with Sodeteg as the construction manager, and Queen City had approved its plans for obtaining subcontractors, tr. 440–441, 493–494, Dominion insisted that Penthouse hire Sigal Construction Company ("Sigal"). Tr. 122–124. Even if the imposition of post commitment conditions were appropriate, this particular one seems totally unreasonable and arbitrary. There is nothing to show that Sigal had any special expertise to recommend it as a builder or consultant for a major project other than a personal relationship between Sigal and the partners of the Melrod firm. Yet, Penthouse was advised that unless it acquiesced to these demands, Dominion would not close the loan. Tr. 33–38, 250–253, 1001.

Finally, Dominion insisted that it replace Queen City as the exclusive lead lender. Tr. 20–21, 27, 247–248. This demand was made even though Dominion had no intention of doing anything with the loan except cheating plaintiffs out of the commitment fee.

Under the circumstances, such actions amounted to an unambiguous refusal to close by Dominion.

## DAMAGES

Plaintiffs allege four categories of damages: (1) out of pocket expenses; (2) expenses for carrying and preserving the property; (3) loss of equity; and (4) loss of profits. In response, defendants argue only that Penthouse's alleged damages are speculative. I disagree.

It is axiomatic that a non-breaching party is entitled to be compensated for damages foreseeably arising from the breach of an agreement. Defendants do not dispute the amounts of, nor, assuming liability, plaintiffs' entitlement to compensation for its out of pocket expenses. To that end, Bendesky testified that Penthouse paid a total of $485,000 in commitment fees to the various participants and $255,000 in brokers fees to Geiger and Jefferson National. Tr. 444–447.

In addition, Penthouse paid $16,000 in appraisal fees; $14,920 for a market study; $10,500 in investigative costs; $205,631.87 to Sodeteg; $16,000 in architectural fees; and a total of $218,572.34 in attorneys' fees. Plaintiff's Exh. 23. Thus, plaintiffs' out of pocket expenses total $1,221,624.20 and they are entitled to receive payment for these damages.

Also, assuming liability, defendants do not dispute plaintiffs' entitlement to its second category of damages for carrying expenses.

Because there is no evidence contradicting plaintiffs' assertions that the time expended trying to find substitute financing, from June 1, 1984 through October 31, 1986, was reasonable, plaintiffs shall be awarded damages for this category as well. William Haggerty ("Haggerty") testified in his affidavit that during this period Penthouse spent a total of $16,599,248 on rent, real estate taxes, salaries, consultants, security, insurance, interest and other items necessary to preserve and carry the property. Haggerty Affidavit, Exh. D.

Plaintiffs' third and fourth categories of damages are somewhat difficult to reconcile. Plaintiffs claim a loss of equity in the property and argue they should receive damages consisting of the amount of their investment in the project less the fair market value of the property at the time of defendants' breach. Plaintiffs further request damages for lost profits. A loss of equity assumes a loss in value, while an especially profitable venture, more often than not, will increase in value. If the casino and hotel were profitable, obviously, there would be no loss of equity. Thus, I find it would not be appropriate to award damages for both a loss of equity and for lost profits.

Because the casino and hotel were never operational defendants argue that damages for lost profits are too speculative to calculate fairly or accurately. I disagree. In *Perma v. Singer Co.*, 542 F.2d 111 (2d Cir.1976) the Court of Appeals stated "the reasonable basis for damages that the law requires is a precise one, barring

only those damages which 'are not the certain result of the wrong, not ... those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.' " *Perma v. Singer Co.*, 542 F.2d at 116 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)). In the instant case it is abundantly clear that defendants' breach directly caused plaintiffs' loss of profits. Where that is the case, and the damages can be assessed with sufficient accuracy, plaintiffs are entitled to receive such damages.

Plaintiffs' expert witness, Peter Tyson ("Tyson"), testified that his estimates of lost profits were based in part on the profits made at other Atlantic City casinos and hotels. Tr. 682. Other factors, such as location and size, were also taken into account. Tr. 669–678. In his affidavit, taken as direct testimony, Tyson stated that the Penthouse casino and hotel would have earned $112,083,583 in profits over ten years if capitalized at a rate of 12%. Thus, plaintiffs are entitled to receive this amount in lost profits.

### DOMINION'S CROSS–CLAIM

■ Finally, in light of the evidence presented at trial and my factual findings based on that evidence, Dominion's crossclaim against Queen City must fail. There is a total failure of proof that Queen City breached any duty owed to Dominion. In fact, the evidence shows just the opposite. Throughout the entire deal Queen City and Lipari acted responsibly and forthrightly by making every reasonable effort to close the loan. There is no evidence that Queen City breached any agreement, fiduciary duty, or that it acted negligently in any way.

### QUEEN CITY'S COUNTERCLAIM

■ Queen City counterclaims against Dominion for breach of its obligations to Queen City. As a direct result of Dominion's failure to close the loan, Queen City claims to have suffered a loss of profits it otherwise would have earned. In one of the documents signed November 21, 1983

Dominion accepted the Queen City Commitment, PTO Exh. B, and thus, Dominion's breach gives rise to claims by all parties to which it was contractually obligated. Having held that Dominion breached its agreement, I must also find it liable to Queen City for that breach.

In his affidavit, taken as direct testimony, Queen City's expert, Raymond Mitch ("Mitch"), calculated that Queen City's lost income amounted to $7,652,352.91. Defendants submit no evidence to contradict this amount. Because I find these damages were reasonably foreseeable, Queen City is entitled to recover the full amount.

In sum, judgment shall be entered for Penthouse in the amount of $129,904,455 and for Queen City in the amount of $7,652,352.91. Plaintiffs and the third-party defendant are directed to submit appropriate judgments within fifteen (15) days of the date of this Opinion on five (5) days' notice.

SO ORDERED.