**In re HANSON INDUSTRIES, INC., a Minnesota corporation, Debtor.**

**Bankruptcy No. 4–87–1478.**

United States Bankruptcy Court, D. Minnesota.

July 18, 1988.

Melvin I. Orenstein, Minneapolis, Minn., for debtor.

William Fischer, Thomas Darling, Minneapolis, Minn., for Bank of New England.

Joseph Dicker, Charles Dietz, Minneapolis, Minn., for Steven Hanson.

Kathryn Page, Trustee, Minneapolis, Minn.

## MEMORANDUM ORDER

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on April 6, 1988, on a motion by the trustee, Kathryn Page ("trustee") for approval of a settlement of a law suit ("the settlement"), "The Bank of New England, N.A., Plaintiff, vs. Hanson Industries, Inc. and Steven D. Hanson, Defendants", originally commenced in Hennepin County District Court (File No. 86–15221) and subsequently removed by

the plaintiff to this court (Adv. No. 4–87–091) ("the pending litigation"). The following appearances were noted: Kathryn Page for the trustee, *in propria persona;* William Fischer and Thomas Darling for Bank of New England ("the Bank"); Joseph Dicker and Charles Dietz for Steven Hanson ("Hanson"); and Melvin Orenstein for Lindquist & Vennum.

This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 103 to hear and finally determine this matter. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Based on the files, records and proceedings herein, including the arguments made by counsel at the hearing, the court makes the following Memorandum Order approving the settlement.

## FACTS

### A. *Procedural History*

Hanson Industries, Inc., ("debtor") was a supplier of resins and retro molding equipment to the plastics industry. Debtor operated profitably through its first thirteen years of business under the management of Hanson, its President and CEO. Before debtor began to experience the difficulties described below, it had gross sales averaging in excess of $10 million per year and employed over 100 people.

In July 1985, debtor entered into a loan transaction with the Bank which was subsequently to form the basis of its underlying claim in the pending litigation. The loan transaction was evidenced by a loan agreement and a security agreement pursuant to which debtor pledged to the Bank, as security for loans to be made to it, virtually all of its assets, including all of its inventory, accounts receivable, equipment, and general intangibles. Debtor executed a revolving demand note in the amount of $1,000,000.00 (pursuant to which $650,-000.00 was advanced to debtor) and a term loan of $1,075,000.00. At the same time, Hanson also executed a note and mortgage on property he owned, in which debtor did business, in the amount of $675,000.00 and a demand note of $50,000.00. Debtor guaranteed all loans to Hanson, and Hanson

guaranteed all loans to debtor. All told, the Bank advanced more than $2 million to debtor and Hanson pursuant to these agreements and that approximate sum was owing by both of them at the time of the filing of the petition in bankruptcy.

Under the terms of the loan agreement, the maximum amount debtor could borrow was established by a formula which took into account the amount of receivables and the value of the inventory. Debtor made payments on the loans through an automatic withdrawal procedure from a checking account which debtor established at the Bank. Debtor and Hanson were current on their obligations through April 30, 1986. On May 27, 1986, however, the Bank, without notifying debtor of its intention to do so, offset the balance of the checking account (approximately $130,000.00) against the indebtedness due under the loans. Thereafter, the Bank dishonored approximately $100,000.00 of debtor's checks, some of which were for employees' wages; reversed later deposits made by debtor into the account for purpose of making payments, treating them as debits rather than credits; and notified several of debtor's customers to make payments directly to the Bank.

Debtor has asserted that these actions caused a severe strain on its operations, causing it to lay off employees and cut down on its operation. The Bank and debtor, after extensive negotiations, were unable to resolve their differences. In July of 1986, the Bank demanded full payment on the loans and, on August 20, 1986, commenced the pending litigation in Hennepin County District Court. In that action the Bank sought foreclosure and return of its collateral, among other things. Debtor counterclaimed asserting a number of theories based on lender liability which will be discussed in greater detail at a later point in this opinion. At the date of commencement of its action, the Bank, having some evidence that debtor and Hanson were purposely diverting the Bank's collateral, sought and obtained an order dated August 20, 1986 prohibiting debtor and Hanson from diverting the Bank's secured assets

from the business. In later proceedings, by order dated January 20, 1987, the state district court denied the Bank's motion seeking replevin of the security and the Bank's motion for summary judgment on the foreclosure counts in its complaint, but continued in effect its order of August 20, 1986, and appears to have invited debtor to seek modification of the terms of that order.

In the meantime, certain of debtor's employees had commenced action in state district court seeking unpaid wages and salary. Serious allegations were made in that litigation by certain of those employees to the effect that debtor and Hanson had from the very beginning of the banking relationship purposely been diverting assets of the debtor to Hanson and his brother, and that Hanson had caused employees to inflate accounts receivable and the value of its inventory in order to deceive the Bank.

On May 1, 1987, the Bank and 35 former employees commenced an involuntary bankruptcy proceeding against the debtor. Debtor then sought relief in state court with respect to continuing use of cash collateral. As a consequence, the Bank removed the pending litigation to this court and, thereafter, debtor and Hanson moved for an order remanding the pending litigation to state court. An order remanding the case was issued by the Honorable Robert J. Kressel. Judge Kressel's order is now on appeal to the district court.

An order for relief in the bankruptcy case was issued on July 21, 1987. At the time, the Bank was owed over $1.5 million by the debtor alone. This motion is brought by debtor's Chapter 7 trustee seeking approval of a settlement which has been agreed to between the Bank and the trustee covering the pending litigation.

### B. The Settlement

The Bank holds a security interest in virtually all of the debtor's property. The trustee has contested the Bank's claim of secured status with respect to a limited portion of the assets upon which the Bank claims secured status. Pursuant to the settlement agreement, and in return for a release of all of the debtor's claims against it, the Bank has agreed as follows:

1. To grant the estate the Bank's secured position in $175,000.00 of proceeds from the settlement of a lawsuit against FSP/Canada.[1]

2. To allow the estate to retain $75,000.00 in proceeds obtained from the sale of the assets of the estate which occurred on December 10, 1987 in the total amount of approximately $700,000.00.

3. To allow the estate to keep the proceeds (approximately $10,000.00) from a November 19, 1987 sale of assets, most of which were covered by a perfected security interest in favor of the Bank.

4. To grant the estate the proceeds (approximately $8,000.00) from the sale of a trailer which was subject to the Bank's security interest.

5. To relinquish to the estate its security interest in the proceeds of a cause of action the debtor has maintained against Dow Chemical Co. which will apparently be settled for approximately $10,000.00.

6. To agree that the Bank will reduce its claim for approximately $52,000.00 in attorneys fees, a claimed administrative expense, to $40,000.00 and to seek as a further administrative expense only 10% of

---

1. One of the areas of contention between the trustee and the Bank is apparently the question of whether the Bank does have a security interest in these proceeds. The Bank argues that the right to proceeds from an impending lawsuit (other than a lawsuit arising solely from tort) constitutes a "general intangible" covered by the Bank's security agreement. See, e.g., Merchants Nat'l Bank of Mobile v. Ching, 681 F.2d 1383, 1388 (8th Cir.1982); Gill v. United States (In re Boogie Enters., Inc.), 79 B.R. 4, 6 (C.D.Cal.1987); Great Western Nat'l Bank v. Hill, 27 Oregon App. 893, 557 P.2d 1367 (1976); Freidman, Lobe & Block v. C.L.W. Corp., 9 Wash.App. 319, 512 P.2d 769 (1973). This rule, the Bank claims, applies even when the lawsuit did not exist at the time the security agreement was entered into and the settlement not reached until after bankruptcy. See Virginia Nat'l Bank v. Phoenix Marine Corp. (In re Phoenix Marine Corp.), 20 B.R. 424, 426 (Bktcy.E.D.Va.1982). Neither Hanson nor the trustee has provided any authority to the contrary.

costs of more than $55,000.00 the Bank incurred in storing assets prior to the sale.

7. To relinquish any claim the Bank may have against the estate for storage of debtor's assets, which claim the Bank asserts could be as high as $200,000.00.

8. To subordinate its general unsecured claim to all other unsecured claims (except any claim of Hanson or Lindquist & Vennum) until 5% of such allowed claims are paid. The Bank asserts that, based on current expectations, this means that it will receive no payment on its unsecured claim of over $1.5 million and asserts this grants other unsecured creditors approximately $45,000.00 the Bank would be otherwise entitled to receive.

In addition to the general release it will obtain, the Bank is retaining its secured interest in accounts receivable, insurance proceeds on any assets stolen from the debtor, and all claims against Steven Hanson. The Bank asserts, and apparently the trustee agrees, that these items probably have limited value to the estate since the Bank already has a security interest in all accounts receivable and is a loss payee on the insurance policy, and would likely be entitled to those sums in any event. Furthermore, the claim against Hanson, while retained by the Bank, may have questionable value since Hanson claims to have no assets to satisfy judgments and pursuit of Hanson by the estate would be costly.

It is anticipated, therefore, that the settlement will net the estate approximately $300,000.00. It is also clear that the settlement will relieve the estate of some expenses, even if these expenses are not nearly as high as the $400,000.00 in expenses claimed by the Bank. It also seems clear that the $300,000.00 expected to be obtained from the settlement will go some substantial way to pay administrative expenses and priority claims (depending on how the court rules on particular claims for administrative expense and priority claims) and that unsecured creditors could anticipate receipt of approximately 5¢ to the dollar rather than nothing.

## DISCUSSION

### A. Standards For Approval

Hanson vigorously opposes the motion to approve the settlement.[2] It is Hanson's position that the settlement should not be approved for two reasons. *First,* Hanson argues, the trustee has not demonstrated that she has adequately investigated the case so as to be able to make a careful judgment on the merits of the settlement. *Second,* it is urged the settlement is not in the best interests of the estate.

■ The settlement of controversies must be approved by the bankruptcy court. Bankruptcy Rule 9019(a). In order to approve the settlement, I must canvas the legal and factual issues raised in the controversy in order to determine whether the proposed settlement is in the best interest of the estate. *See, e.g., LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.),* 841 F.2d 159, 161 (7th Cir.1987); *Lindquist v. First Northtown Nat'l Bank (In re Lakeland Dev. Corp.),* 48 B.R. 85, 89 (Bktcy.D.Minn.1985), *aff'd,* 782 F.2d 1048 (8th Cir.1985), *cert. denied,* 476 U.S. 1130,

---

**2.** The law firm of Lindquist & Vennum, counsel who represented debtor in the bankruptcy proceeding, also filed an opposition to the motion for approval of the settlement. Lindquist & Vennum specifically objected to paragraph 15 of the proposed stipulation, believing that it suggested that the claims of Steven Hanson and those of Lindquist & Vennum could somehow be subordinated and deprived of the distributions to which they might rightfully be entitled under sections 507 and 726 of the Bankruptcy Code. Lindquist & Vennum's opposition, however, acknowledged that paragraph 15 might be considered ambiguous and unclear in this respect. In response, the Bank and the trustee have prepared a clarification of paragraph 15 which will become part of the settlement agreement upon the court's having approved it. That clarification specifically indicates that paragraph 15 in no way is to affect any priority claims and that paragraph 15 applies only to general allowed unsecured claims; clarifies the Bank's agreement to subordinate its unsecured claim; and makes clear that paragraph 15 in no way affects the claims of Hanson and Lindquist & Vennum as they might be allowed under the Bankruptcy Code. The court's approval of this settlement is conditioned upon the clarification of paragraph 15 becoming part of the settlement agreement which should alleviate the concerns of Lindquist & Vennum.

106 S.Ct. 1999, 90 L.Ed.2d 680 (1986); *In re Arrow Air, Inc.,* 85 B.R. 886, 889–92 (Bktcy.S.D.Fla.1988); *In re Bell & Beckwith,* 77 B.R. 606, 611 (Bktcy.N.D.Ohio 1987). The trustee has the burden of proof in establishing that the proposed settlement is appropriate. *American Reserve,* 841 F.2d at 161.

The criteria to be reviewed in deciding whether I will approve the proposed settlement are well established. In deciding whether to approve the proposed settlement, I must determine whether the settlement is in the best interests of the estate. *See Bell & Beckwith,* 77 B.R. at 612; *Lakeland Dev.,* 48 B.R. at 89.

> In determining whether to approve the trustee's proposed settlement, the court does not substitute its judgment for that of the trustee.... Instead, the court will at the hearing on the proposed settlement, "canvas" the issues and see if the settlement falls below the lowest point in the realm of reasonableness.

*Bell & Beckwith,* 77 B.R. at 612. The criteria to be considered include the following:

> 1. The probability of success on the merits in the litigation.
>
> 2. The difficulties, if any, to be encountered in collection of any judgment that might be obtained.
>
> 3. The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it.
>
> 4. The paramount interests of the creditors and the proper deference to their reasonable views in the premises.

*Lakeland Dev.,* 48 B.R. at 89. I may also consider whether continuation of the litigation promotes the integrity of the judicial process. *Id.* In making these determinations the court must be provided with a sufficient evaluation of the litigation in order to canvas those issues and determine if the settlement is reasonable. *See American Reserve,* 841 F.2d at 161–63; *In re Technology for Energy Corp.,* 56 B.R. 307, 311 (Bktcy.E.D.Tenn.1985).

## B.  Reasons For Approval of the Settlement

■ Central to debtor's case is its argument that the Bank acted improperly when, after knowingly allowing overadvances to occur in debtor's account for several months, the Bank suddenly charged back the loan overadvances against the balance due in debtor's checking account. Debtor had been overadvanced in its loan balances for the months of February, March and April, in sums which at times reached $150,000.00. It is debtor's position that because the overadvances were tolerated for at least three months or more the Bank is disqualified from relying on those overadvances as a cause for claiming default under the loan agreements. Affidavits and memoranda filed by the Bank in connection with the motion to approve the settlement demonstrate, however, that at the time the Bank applied the checking account funds to the loan balances, debtor was in fact overadvanced in the sum of approximately $400,000.00 and that a number of other defaults had come to the attention of the Bank. Events at about this time, apparently acknowledged to be correctly described, were as follows.

On May 23, 1986, Phillip Nelson, a bank officer involved with the account, received a period-end recapitulation report for debtor dated April 30, 1986, and a similar recapitulation report for the debtor dated May 17, 1986. The April recapitulation report indicated an overadvance in the amount of $87,292.00, stated that withholding taxes had not been paid in full, and contained a questionable inventory entry of exactly $1,000,000.00 (the latter of which led Nelson to believe that the number might be suspicious or fraudulent, since the loan agreement required the company to maintain a minimum $1,000,000.00 inventory). The recapitulation report dated May 17, 1986 showed an overadvance of $157,-558.74, continued to show that withholding taxes had not been paid, and continued to carry the $1,000,000.00 suspicious valuation on inventory.

Having received these documents, representatives of the Bank and debtor, includ-

ing Hanson, met on May 27, 1986. At that meeting, according to Nelson,

1. Hanson revealed that the loss projections of the company for 1986 had been increased from approximately $.5 million to the approximate net worth of the company for 1986 ($1.2 million).

2. Hanson stated that he needed $200,000.00 but did not make clear whether this was in addition to the existing overadvance.

3. Hanson stated that he was not willing, or was unable, to give certain financial information involving the company, including day-by-day cash flows, and stated that he did not know when he would be able to get them.

4. Hanson had previously stated that an account receivable from U.S. Silicate had been converted to a secured loan. At the meeting Hanson revealed that the loan was, in fact, unsecured (later developments, according to the Bank, were to establish that the entire U.S. Silicate account was nonexistent).

According to Robert Bender, an auditor for New England Commercial Finance Corporation, immediately following the meeting of May 27, 1986, he went to debtor's facilities to examine certain of its records. At that meeting he was handed an inventory sheet which stated that the amount of available inventory was approximately $701,000.00, with the result that debtor was, in fact, $401,000.00 overadvanced. Bender believes that the document he was given was prepared before the May 27, 1986 meeting between the Bank and Hanson, and that the decrease in inventory had not been disclosed at the meeting. While at debtor's facilities on May 27, 1986, Bender obtained from Jerry Williams, an officer of the debtor, a new certificate acknowledging that debtor was overadvanced in the amount of $401,634.73 and that withholding taxes had not been paid. The certificate appears to have been signed by Hanson also. Bender also swears that debtor and/or Hanson refused to provide further books and records in order to continue a more thorough investigation.

Thus, at the time it acted, the Bank claims that it knew of at least four possible defaults under the agreements. These included: 1) the debtor was overadvanced or "out of formula" in a sum which was nearly four times that previously allowed; 2) the debtor had failed to pay withholding taxes; 3) the debtor's projected losses created a reasonable doubt as to debtor's ability to pay, and 4) the debtor was behind in payment of principal and interest. In addition, the Bank asserts, debtor's credibility had been seriously called into question by the events surrounding the U.S. Silicate account and by the vacillating numbers relating to inventory. It was after these events that the Bank, on May 27, 1986, determined to apply the sum of approximately $130,000.00 remaining in the debtor's checking account against the loan overadvances and it is against this background that I judge each of the criteria I am required to address in ruling on this settlement.

1. Likelihood of Success on the Merits.

Debtor's state court case is framed in several counts, including breach of contract; breach of duty of good faith and fair dealing; libel, slander and defamation; tortious interference with business relations; equitable subordination; and abuse of process. Each count appears to this court to be subject to serious difficulties of proof. In particular, its key claim rests on a theory of potential liability which remains untested in this state and in most states.

With respect to the breach of contract count, the Bank will be able to show a number of defaults in fact existed in the terms of the loan agreement and security agreement at the time the Bank took action to apply the balance of the checking account against the loan balances. These include an overadvance, failure to pay withholding taxes, and failure and refusal to provide the Bank with financial books and records. Furthermore, Hanson's reclassification of the significant receivable allegedly from U.S. Silicate (which later turned out to be fictitious), a jury could find, raised a reasonable doubt as to debtor's ability to repay, creating what could clearly

be found to be another event of default. As for the claims for libel, slander and defamation, they rest on debtor's contention that the Bank wrongfully dishonored its checks. Rightful dishonor of checks is, however, appropriate and clearly allowed. *See Nietzel v. Farmers & Merchants State Bank*, 307 Minn. 147, 238 N.W.2d 437, 439–40 (1976). The Bank has persuasive arguments for its position that the dishonor was appropriate. The claim for tortious interference with business relations and contract, resting as it does on the Bank's contact of customers asking that money owing be paid directly to the Bank, was arguably appropriate under Minn.Stat. § 336.9–503. The claim for equitable subordination, which relies on 11 U.S.C. § 510(c), would be difficult to prove. *See Bergquist v. First Nat'l Bank of St. Paul (In re American Lumber Co.)*, 7 B.R. 519, 528–29 (Bktcy.D. Minn.1979). Even more tenuous is the debtor's claim for abuse of process which relates to the Bank's obtaining the August 20, 1986 injunction.

The crux of debtor's counterclaim is one for lender liability resting on a claim that the Bank owed debtor a fiduciary duty to act in good faith. There is, it is true, an emerging area of the law revolving around lender liability. Hanson cites, for example, the case of *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), in which it was held that termination of a bank customer's accounts without prior notice was actionable and a substantial verdict was awarded. *Id.* at 766. Surely Hanson or debtor could find other cases for the proposition that banks are increasingly being held to a higher standard of care in their relationships with their clients. *See, e.g., Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1374–75 (9th Cir.1987); *Penthouse Int'l, Ltd. v. Dominion Federal Savings & Loan Assoc.*, 665 F.Supp. 301, 311–12 (S.D.N.Y.1987). Huge judgments were entered both in *Landes* and in *Penthouse*, and these judgments have caused lenders to take much more care in their dealings with their clients. *See Lender Liability Still Lurking*, A.B.A.J. 42 (May 1, 1988). However, as the ABA Journal article points out, "despite the huge judgments, [an expert] cautions lawyers for borrowers against being hasty in bringing suits because lenders still win about 9 or 10 liability cases." The article also points out that banks do not traditionally fare well before juries and that concerns of a jury trial may well lead banks to take extra care. *Id.* My view is that it is precisely this type of concern which has caused the Bank to offer the settlement it has offered in this case. I also believe, however, that, under the facts as presented here, the hurdles to be surmounted by the debtor should it continue to pursue the pending litigation are so substantial as to be overwhelming.

A key difficulty in the plaintiff's case is the fact that in large measure it rests on the testimony of Steven Hanson.[3] Should Hanson testify in the pending litigation, the Bank would be able to attack his credibility by establishing the following:

1. Hanson has made similar claims for lender liability against other banks on earlier occasions.

2. Hanson arranged to divert approximately $200,000.00 in debtor's assets into companies owned and controlled by Hanson's brother.

3. Hanson fabricated information relating to the U.S. Silicate for the purpose of leading the Bank to believe the company's receivables were higher than they were.

4. Hanson instructed employees to inflate receivables and inventory so as to deceive the Bank.

5. Hanson drew large sums out of debtor's accounts under suspicious circumstances.

6. Hanson instructed employees to make certain customers pay outside normal company procedures so as to make sure the Bank did not learn of those accounts.

---

3. As the Bank points out, three other federal judges (Bankruptcy Judge Mahoney, Bankruptcy Judge O'Brien and District Court Judge Magnuson) have already questioned Hanson's veracity.

7. In violation of a court order, Hanson allowed a secured creditor other than the Bank to take possession of valuable collateral even when the Bank had a prior interest. In return, Hanson received a release of his personal guaranty.

8. After the Bank commenced the pending litigation, Hanson, in violation of a court order, opened a second bank account and deposited customer payments in it. The opening of the account using Bank collateral, the deposit of accounts receivable pledged to the Bank, and transfer of funds to creditors were in violation of a court order.

9. Debtor has manipulated bank accounts so as to make sure that the Bank would have great difficulty obtaining funds.[4]

Successful jury cases and certainly cases such as this, rest in large part on a jury's willingness to believe the plaintiff's principals. Hanson, with a record like this established through documentation and the testimony of his former employees, is hardly a perfect witness.

Finally, with respect to the likelihood of success on the merits, there is the difficult question of damages. Documents prepared by debtor itself show that debtor was losing money in large sums at the time the Bank took action.

In judging likelihood of success on the merits, I have tried to view this case as a plaintiff's lawyer might. Based on my experience and belief, given especially the disabling credibility problems plaintiff would deal with at trial, I view the possibility of success on the merits as remote. Perhaps one test might be whether quali-

fied lawyers would take the case on a contingency fee basis. The trustee has advised that preliminary attempts to secure counsel for the estate under such terms have proved fruitless; counsel familiar with the case who represented debtor in the past have apparently also declined to further pursue the case on that basis.

2. Difficulties, if any, to be Encountered in Collection.

The Bank appears to be a substantial potential judgment debtor and admits it has the wherewithall to respond to a judgment in the millions, which is what Hanson claims it is worth. This factor, therefore, is a neutral one in the court's decision making process.

3. The Complexity of the Litigation, and the Expense, Inconvenience and Delay Necessarily Attending It.

This would not be a plaintiff's case either easily tried or easily prepared. The debtor has apparently done no merits discovery and estimates of the cost of pursuing the claim range over $100,000.00.[5] The trustee has advised the court that there are no funds available to cover such costs and she has been unable to obtain a commitment from any attorneys to take the case on a contingency fee basis. Hanson, who will remain a plaintiff in the pending litigation regardless, likely does not have the funds to expend in further pursuit of the pending litigation or has chosen not to fund it.[6]

There are difficult and complex questions of both law and fact. The key theory upon which the case rests is as yet untried or undeveloped in this state and debtor might never get to a jury on that issue. There

---

4. In support of its opposition to the settlement, Hanson has submitted an affidavit of Jerry Williams who was formerly an officer of debtor. Williams avers that an officer of the Bank made private arrangements with Williams, without the knowledge of Hanson, to police the loan more closely than Hanson knew or authorized. Also, Williams swears that the Bank did so in order to wrench control of debtor from Hanson himself. If believed, Williams' testimony could go a substantial way in establishing a control factor by the lender. Unfortunately for debtor his testimony would likely be subject to serious credibility issues also. For example, Williams prepared many of the Recapitulation Reports

containing improper numbers and he seems to be implicated in some of the alleged diversions by Hanson. Furthermore, the court questions why Williams did not come forward sooner, since these matters have been vigorously litigated for nearly two years. His story, moreover, is somewhat incredible.

5. To be sure, such estimates can be woefully off, one way or the other.

6. In October 1987, Lindquist & Vennum withdrew from representation of Hanson in the case. He subsequently secured the new counsel who is currently representing him.

are numerous factual questions, many of which appear to turn on the credibility of witnesses, adding to the downside risk. The defendant is located out of the state and depositions and discovery costs are therefore likely to be exceptionally high. The file is already filled with affidavits from several people scattered throughout the country who seem to have relevant testimony to give. Since Hanson's dealings were centered in Reno, Nevada, Minneapolis, Minnesota, and Boston, Massachusetts, the case could entail discovery costs in at least these states and perhaps more. Relevant documents appear to be in the possession of numerous entities other than the parties, located also in at least three states. This would not be a short trial and its complexity almost assures an appeal.

### 4. Interests of creditors

No creditors have objected to the settlement, other than Hanson, who would or might stand to gain by the estate's continuation of the lawsuit, and Lindquist & Vennum which has objected on grounds which appear to have been resolved. Excluding the Bank, the unsecured creditors' claims are in the range of $1.2 million. This settlement, while not perfect, offers some hope of minimal payment to the unsecured creditors; without it, they take a gamble on a piece of litigation which would likely drag on in the future and which could drain the estate of any assets it might otherwise have for distribution. Settling for less than one might like is often the best answer to resolve what has become a "can of worms." It is possible that if all things went well and every break fell in plaintiff's favor, the plaintiff could secure a judgment in a very large sum. Perhaps it is also possible that the trustee could have obtained a better deal if she had studied the case a bit more or pushed a little harder. But, a gamble on poor risks like this one is not in the best interests of the estate. And, contrary to Hanson's contentions, I find no fault with the thoroughness of the trustee's review of the merits of the case.

I have an ample record to conclude, as I do, that the settlement should be approved because it is in the best interests of the estate.[7]

For the foregoing reasons, IT IS HEREBY ORDERED that:

The Stipulation, Release and Agreement dated March 8, 1988, as amended by that certain Clarification of Paragraph 15 as yet undated, by and between the Bank of New England, N.A., the bankruptcy estate of Hanson Industries, Inc., and the trustee of the bankruptcy estate of Hanson Industries, Inc., which settles and resolves the case of "The Bank of New England, N.A., Plaintiff v. Hanson Industries, Inc. and Steven D. Hanson", (Adv. No. 4–87–0191) is hereby approved. This approval shall in no way affect the continuing rights of Steven D. Hanson in the litigation nor the rights Steven D. Hanson and/or Lindquist & Vennum may have as claimants, in any status, under the Bankruptcy Code.

---

7. A final factor, sometimes considered, is whether continuation of the litigation will further the integrity of the judicial system. While the factor does not weigh heavily, it does appear that denial of approval of the settlement would allow Hanson to take a free ride on debtor's efforts in the litigation.