PENTHOUSE INTERNATIONAL, LTD.,
and Boardwalk Properties, Inc.,
Plaintiffs–Appellees,

v.

DOMINION FEDERAL SAVINGS &
LOAN ASSOCIATION, and Melrod,
Redman & Gartlan, P.C., Defendants–
Appellants.

DOMINION FEDERAL SAVINGS &
LOAN ASSOCIATION, Third-party
Plaintiff–Appellant,

v.

QUEEN CITY SAVINGS & LOAN
ASSOCIATION, Third-party
Defendant–Appellee.

Nos. 862, 863, Dockets 87–9039, 87–9053.

United States Court of Appeals,
Second Circuit.

Argued March 7, 1988.
Decided Aug. 26, 1988.

Milton S. Gould, New York City (Joseph Ferraro, Susan B. Ratner, Shea & Gould, New York City, of counsel), for plaintiffs-appellees Penthouse Intern., Ltd. and Boardwalk Properties, Inc.

Peter C. Alkalay, New York City (Jacqueline A. Braun, Nitkin Alkalay Handler & Robbins, New York City, of counsel), for third-party defendant-appellee Queen City Savings & Loan Ass'n.

Dorothy L. Nichols, Sr. Associate Gen. Counsel, James J. Igo, Trial Atty., Jordon Luke, Gen. Counsel, Jack D. Smith, Deputy Gen. Counsel, Washington, D.C., for amicus curiae Federal Home Loan Bank Bd.

Wendy B. Samuel, Washington, D.C., for amicus curiae National Counsel of Sav. Institutions.

Arthur L. Liman, New York City (Steven B. Rosenfeld, Allan Blumstein, John D. Worland, Jr., Robert Atkins, Sanford Hausler, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Robert L. Tofel, David B. Newman, Fine, Tofel, Saxl & Berelson, P.C., New York City, of counsel), for defendant-third-party plaintiff-appellant Dominion Federal Sav. & Loan Ass'n.

Marvin E. Frankel, New York City (Ellen R. Nadler, Jeffrey S. Trachtman, Jason Brown, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellant Melrod, Redman & Gartland P.C.

Before MESKILL and ALTIMARI, Circuit Judges, and MISHLER, District Judge.*

ALTIMARI, Circuit Judge:

Defendants-appellants Dominion Federal Savings & Loan Association ("Dominion") and Melrod, Redman & Gartlan, P.C. ("Melrod" or the "Melrod firm") appeal from judgments entered in favor of plaintiffs-appellees Penthouse International, Ltd. and its wholly-owned subsidiary, Boardwalk Properties, Inc. (hereafter referred to as "Penthouse"), and third-party defendant-appellee Queen City Savings & Loan Association ("Queen City"). After a three-week bench trial in the United States District Court for the Southern District of New York (Judge Kevin T. Duffy), the district court held that Dominion committed an anticipatory breach of its agreement to participate in a $97 million loan transaction. The district court awarded Penthouse approximately $128.7 million and awarded Queen City nearly $7.7 million (plus interest and costs) for the damages caused by Dominion's anticipatory breach. In addition, the court dismissed with prejudice Dominion's cross-claim against Queen City. After the court issued its opinion, it ordered that the Melrod firm be held jointly and severally liable for the Penthouse judgment, not on breach of contract grounds, but for fraud.

Dominion and the Melrod firm present several arguments on appeal. Dominion's principal contention is that the district court erred when it found that Penthouse carried its burden of demonstrating the existence of an anticipatory breach and that, in absence of the breach, Penthouse had the ability to perform its contractual obligations before the loan commitment expired. The Melrod firm argues that there is no basis in law or fact for holding it liable for the Penthouse judgment.

For the reasons that follow, we reverse in part, affirm in part and remand.

## FACTS and BACKGROUND

Sometime after gambling was legalized in Atlantic City, New Jersey, Penthouse's President, Robert Guccione, conceived the idea of opening a Penthouse Hotel and Casino along Atlantic City's famed Boardwalk. To implement this idea, Guccione set about to locate prospective financiers and potential partners to assist in underwriting the construction project. Boardwalk Properties, Inc. was formed as a wholly-owned

---

* Honorable Jacob Mishler, Senior District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

subsidiary of Penthouse for the purpose of handling Penthouse's affairs in connection with the hotel and casino project.

Initially unsuccessful in its efforts to obtain outside financing, Penthouse used its own resources to commence the project. Penthouse proceeded to assemble five contiguous plots of land along Missouri Avenue adjacent to the Boardwalk. Three of these parcels Penthouse held in fee simple and the other two were obtained through leasehold estates. The first leased property, on which was located a Holiday Inn Hotel, was obtained from the Boardwalk and Missouri Corporation, an entity controlled by New York real estate financier Harry Helmsley (the "Helmsley lease"). The second leasehold estate, which was then occupied by a Four Seasons Hotel, was obtained from Albert and Robert Rothenburg (the "Rothenburg lease").

Penthouse's construction plans included the use of the existing tower structure from the Holiday Inn, the rebuilding of the structure from the Four Seasons into a second tower and the construction of a seven-story building between the two towers. In these structures, Penthouse planned to house its casino, a 515 room hotel, a health club and other facilities. By June 1983, Penthouse had invested between $65 and $75 million into construction of the hotel and casino which was approximately 40 to 50 percent complete.

Although Guccione believed that the entire project could be financed with Penthouse's own funds when construction commenced, as time passed and costs escalated, it became apparent that it would be necessary to obtain outside financing. Penthouse then sought financing unsuccessfully from various sources. In or about April 1983, Penthouse retained Jefferson National Mortgage, a mortgage broker, to locate prospective lending institutions interested in providing Penthouse with construction and permanent financing for the hotel and casino project. As a result of Jefferson National's efforts, Queen City extended to Penthouse in June 1983 a $97 million loan commitment.

On June 20, 1983, Queen City issued to Penthouse (through Boardwalk Properties, Inc.) a commitment to lend Penthouse $97 million for construction and permanent financing in connection with the Penthouse Hotel and Casino project (the "Queen City loan commitment" or the "loan commitment"). The Queen City loan commitment was accepted by Penthouse on June 29, 1983. In the loan commitment, Queen City advised Penthouse that "your request for construction/permanent financing ... with Queen City Savings and Loan Association ... has been approved subject to the following terms and conditions[.]" The term of the loan was ten years with a construction phase in effect during either the first 24 months or until Penthouse received a certificate of occupancy from Atlantic City and permission to operate the casino. The interest rate was fixed at 14⅞% for years one through five and 15⅝% for years six through ten.

To secure the loan, pursuant to paragraph 6 of the loan commitment, Penthouse was required to deliver to Queen City a mortgage on the hotel and casino and the underlying properties. Thus, Penthouse was required to deliver a note secured by a "valid first mortgage lien on all real estate owned by [b]orrower covering the project site" and all improvements thereon and was required to provide a "valid first leasehold interest" in the Rothenburg and Helmsley leases and "a first mortgage covering the improvements thereon." Penthouse also was required to provide assignments of its interest in the leasehold estates to be effective in the event of Penthouse's default. Paragraph 6 required Penthouse to certify at closing that there were "no violations" of the Helmsley or Rothenburg leases.

Paragraph 14 of the loan commitment required Penthouse to represent and warrant 1) that there was no pending litigation that would affect title to the properties, the validity of the mortgage liens, the validity and non-violations of the leases, etc., 2) that the final plans and specifications for construction would satisfy and conform with local, state and federal regulations, and 3) that all necessary utilities (i.e., wa-

ter, electricity, sewer, telephone service and gas) were available to the full needs of the property and that "valid and enforceable agreements to supply such services have been entered into[.]"

Under the heading of "Commitment Expiration Date," paragraph 15 provided that the commitment would

expire one hundred twenty (120) days after the date hereof (the "Commitment Expiration Date") unless mutually extended in writing by Lender, and upon such expiration Lender shall have no further obligation to Borrower, except as set forth in item 19 of the attached Conditions.

Paragraph 16 of the commitment, which was headed by the term "Closing", stipulated that the "[c]losing of the Loan ("Closing") shall be held ... on or before the Commitment Expiration Date[.]"

Paragraph 17 of the loan commitment provided that an additional twenty enumerated "Conditions Prior to Closing" ("preclosing conditions") contained in a document attached to the commitment were incorporated as part of the commitment. Paragraph 17 also stipulated that "[l]ender's obligation to close the Loan [was] contingent upon the satisfaction of each of said conditions."

In relevant part, the preclosing conditions provided:

\* \* \* \* \* \*

5. TITLE INSURANCE: There shall be furnished to Lender, at least 15 days prior to Closing, a current preliminary title insurance binder, issued by a title company initially approved by Lender. At Closing, a standard ALTA title policy shall be issued by such company insuring Lender's interest or lien in or on the Property subject only to such title objections as Lender shall approve. Such title insurance policy shall affirmatively insure the priority of the lien of the Mortgage. The title company insuring Lender's lien shall obtain re-insurance in such amounts and with such companies, as Lender may require.

\* \* \* \* \* \*

10. UTILITIES: The Lender shall be furnished with copies of all agreements for providing the utility services required for the operation of the Property, including without limitation thereto, agreements pertaining to water, sewer, and electricity and/or original current letters from the suppliers of such utilities stating that the utilities are available and are offered in sufficient quantities for the project.

11. PLANS AND SPECIFICATIONS: The written approval of all plans and specifications for the Improvements to be erected must be obtained from Lender. No change of any substance shall be made in the final plans and specifications without the prior written approval of Lender and all governmental authorities having jurisdiction.

12. CERTIFICATION BY ARCHITECT AND CONSTRUCTION MANAGER: Borrower shall deliver to Lender at Closing a certification by Borrower's architect and construction manager containing (i) a detailed listing of the then-current plans and specifications for the Improvements; (ii) a statement that said plans and specifications are complete documents for the construction of the Improvements and contain all details requisite for the completion, occupancy and operation thereof; and, (iii) a statement that said plans and specifications are in full compliance with all local, state and federal (if any) rules, ordinances and regulations governing or applying to the construction of the Improvements.

\* \* \* \* \* \*

16. CONSTRUCTION—CONTRACTS: Borrower shall submit, for Lender's approval, Borrower's contract with its architect, construction project manager and all major trade contractors. Lender may at its option require assignment of the aforesaid contracts or any of them.

\* \* \* \* \* \*

19. PARTICIPATION: Lender's obligation to complete the Closing is also contingent upon execution of a participation agreement between Lender and other lenders pursuant to which said other lenders will participate in making the Loan (through

the Lender as "lead institution") at least to the extent of $90,000,000.00 on terms and conditions satisfactory to the Lender. Borrower acknowledges that it is Borrower's sole responsibility (either directly or through mortgage brokerage companies) to obtain such participants who are satisfactory to Lender, it being understood that Lender shall have no obligation to obtain such participants. In the event the aforesaid $90,000,000.00 participation agreements are not obtained, then Lender shall refund to Borrower the origination fees it received pursuant to Item 8 of the Commitment.

\* \* \* \* \* \*

The preclosing conditions also established that New Jersey law would govern the terms of the loan commitment and stipulated that Queen City's attorneys would have the final decision on whether the various preclosing conditions had been satisfied. Nowhere, however, did the commitment or the preclosing conditions provide that Queen City was authorized by the participating lending institutions to waive Penthouse's compliance with any of the terms of the commitment.

Once the loan commitment was in place, pursuant to preclosing condition 19, Queen City and Penthouse began searching for financial institutions interested in participating in a syndicate of lenders to underwrite the loan. Lending institutions that decided to participate in the syndicate (the "participants") would enter into a "Loan Participation Sale and Trust Agreement" (the "participation agreement"). Under the commitment, Queen City was designated to serve as the lead lending institution (the "lead lender") for the syndicate. Under the participation agreement, the participants would purchase from Queen City "undivided participating ownership" interests in the mortgage loan. Pursuant to the participation agreement, Queen City assumed various administrative responsibilities for servicing the loan. The agreement stipulated, however, that Queen City was to act, not as an agent, but as an "independent contractor" for the participants and would serve "as a trustee with fiduciary duties" in connection with protecting the rights of the participating lenders. In addition, the participation agreement contained an integration clause, provided that it could not be modified except by written agreement and established New Jersey law as the governing law.

By the fall of 1983, twelve financial institutions, including Queen City, had agreed to participate in the financing syndicate and had committed to provide a total of $62 million for the project. In mid-November 1983, Dominion expressed interest in providing Penthouse with financing and on November 14th offered directly to Penthouse a commitment to provide $40 million in financing for the project. Although Dominion's offer was never accepted, it did lead to Dominion's decision on November 21, 1983 to participate in the $97 million loan syndicate.

On November 21, 1983, a meeting was held at Penthouse's offices in New York City. In attendance at the meeting were representatives of Penthouse, including its Chief Operating Officer and General Counsel, David J. Myerson, and Penthouse's outside counsel for the loan transaction, Jay Newman; representatives of Queen City, including its Senior Vice President, John E. Beahan, and Queen City's attorney, John J. Lipari; and representatives of Dominion, including its Executive Vice President, David A. Neal, and its outside counsel, William J. Dorn. At this meeting, Dominion agreed to participate in the loan syndicate to the extent of $35 million. Dominion's agreement to participate in the loan was embodied in three documents: two letter agreements exchanged between Queen City and Dominion and a third document which was a letter from Penthouse to Dominion. In substance, Dominion "accepted" all of the terms and conditions of both the loan commitment and the participation agreement except that the participation agreement was amended to include Dominion as "co-lead seller" for the syndicate. In addition, the loan commitment was modified at the meeting in a side agreement between Penthouse and Queen City to include as a preclosing condition that "arrangements, reasonably satisfactory to

[Queen City], shall have been made with the staff o[f] the Casino Control Commission to permit the opening of the casino and hotel, upon completion of construction, utilizing a trustee or fiduciary in the event the license to [Penthouse] ... or any of its principals has not been granted."

Although it does not appear that Dominion entered into any written agreement with Penthouse directly, Penthouse did deliver to Dominion a letter indicating that it agreed to pay Dominion certain fees "[i]n consideration" for Dominion's agreement to participate "as a Co–Seller" for the syndicate. Penthouse also gave Dominion a check for $175,000 for fees it agreed to pay.

Also on November 21st, Penthouse and Queen City mutually agreed to extend the Commitment Expiration Date to December 1, 1983. This written extension was prompted by Lipari's observation that the 120–day condition of the commitment had expired and his belief that, in order to have a "valid commitment," it was necessary for Queen City and Penthouse to mutually extend the expiration date. In addition, Lipari discussed the timing of the loan closing with Newman and Dorn, and then, in a letter also dated November 21st, Lipari and Newman agreed that "we shall close th[e] loan no earlier than February 1, 1984 or later than March 1, 1984."

Once the loan commitment syndicate was complete, Penthouse and Queen City directed their efforts to closing the transaction. Toward that goal, Lipari and Newman maintained regular contact and Lipari held a series of "status meetings" during which representatives of Penthouse and Queen City reviewed the steps taken in connection with Penthouse's satisfaction of the preclosing conditions. During these status meetings, Penthouse sought alternate arrangements for satisfying some of the preclosing conditions. For example, although preclosing condition 10 required Penthouse to deliver copies of all agreements for providing utility services required for the operation of the hotel and casino and/or original, current letters indicating that the utilities would be available in sufficient quantities for the project, Penthouse sought to proceed without having fully satisfied this condition. Penthouse did not have agreements with some utility companies to provide certain essential services and it did not have written assurances that those services were available to meet the demands of the proposed hotel and casino. Similarly, Penthouse sought to proceed to closing without having fully complied with preclosing conditions 11, 12 and 16.

Penthouse's position in this regard was that, since the construction project was 40 to 50 percent complete, many of the requirements of the preclosing conditions could be satisfied through substitute arrangements. Thus, instead of providing an architect's and construction manager's certificate, as required by preclosing condition 12, Penthouse offered to provide a certificate from its project engineer and to allow Queen City's architect to examine the project. This substitute performance was necessary because, at that time, Penthouse had not retained an architect. In place of providing Queen City with copies of final plans and specifications for the project, as required by the preclosing conditions, Penthouse sought to provide Queen City with its original plans and specifications for the project, even though they were out of date due to changes in the applicable building codes and despite the fact that Penthouse had no final plans for the electrical or mechanical work on the project. Notwithstanding the modifications Penthouse sought, Lipari was satisfied that the transaction could close in light of Penthouse's proffered substitute performance. It does not appear, however, that Lipari sought Dominion's or the other participants' consent to a waiver of Penthouse's full compliance with any preclosing conditions.

After the second status meeting, Queen City sent Dominion and the other participants a letter stating in essence that substantial progress had been made toward satisfying the preclosing conditions and announcing that a "preclosing meeting" would occur sometime between February 1 and 8, 1984. It was later determined that the "preclosing meeting" would occur on

February 9, 1984 at Penthouse's New York offices.

Once Dominion agreed to participate in the loan syndicate, it proceeded to attempt to sell in the secondary market sub-participation interests of its $35 million interest in the loan syndicate. Dominion's decision to sub-participate out its interest in the loan was motivated in part by the fact that its legal lending limit was $18.5 million. Thus, Dominion could not lend to a single borrower more than that amount. By letter agreement dated December 2, 1983, Dominion sold to Community Savings & Loan Association ("Community") a $17.5 million interest in its original $35 million participation interest. At that time, Community had not completed its underwriting analysis of the loan, and proceeded with this analysis in December 1983 and continued on through February 1984. In early-February 1984, however, Community started to show some reticence with proceeding in the transaction.

As Penthouse and Queen City prepared for the "preclosing meeting" set for February 9, 1984, Newman received a letter from Commonwealth Land Title Insurance Company regarding Penthouse's ability to furnish the mortgage security required by the loan commitment. This letter indicated that there were several objections to title on the Helmsley lease. That parcel was subject to two mortgages, the McShane mortgage and the Chase mortgage, which needed to be discharged or subordinated before Penthouse could furnish the required security. Unless the McShane and Chase mortgages were discharged or subordinated, if foreclosed upon, they potentially could wipe out the Helmsley lease and any security interest in that lease. The letter also raised title objections to the Rothenburg lease and pointed out that there was a declaration of encumbrances in connection with the parcels held in fee simple which had to be removed or modified. In addition to the title problems, it also appears that the Helmsley lease had to be modified before closing. Unless the lease was modified, the closing of the loan would violate its terms. The commitment required, however, that Penthouse certify, at closing, that there were "no violations" of that lease.

To resolve the various title problems and the problems with the terms of the lease, Newman knew that he would have to negotiate a discharge or subordination of the McShane and Chase mortgages, negotiate with Helmsley to obtain amendments to the lease and obtain a subordination of encumbrances in connection with the Helmsley leased property. Although Penthouse had made some initial contacts with Helmsley's representatives by February 9th, no agreement resolving these problems had been reached, nor had actual negotiations with Helmsley's representatives commenced. It is also unclear whether the holders of the Chase and McShane mortgages were willing to discharge or subordinate their liens because they apparently had not been contacted by February 9th.

On February 9, 1984, representatives of the parties to the loan transaction and the participants met at Penthouse's offices in New York City for the preclosing meeting. Among several others, Lipari was present to represent Queen City and Newman was there representing Penthouse. Penthouse's Myerson made sporadic appearances throughout the meeting. Dominion was represented by Philip Gorelick of the Melrod firm who had been brought into the deal on February 8th. At the meeting, after Penthouse made a presentation of a scale model of the planned hotel and casino, Lipari handed out some press clippings, copies of status reports and copies of draft loan closing documents. He then reviewed each of the preclosing conditions and described the progress made toward their satisfaction. Among the draft closing documents Lipari circulated was a standard, preprinted, six-page "Blumberg" form for a "plain language" mortgage and a standard, six-page, preprinted form for a "security agreement" for the furniture and fixtures. At the top of the Blumberg form appeared the admonition: "Consult your lawyer before signing this mortgage—it has important legal consequences." The draft mortgage included a rider requiring that Penthouse satisfy each of the preclos-

ing conditions. Nowhere in the draft closing documents was there a provision allowing for preclosing conditions to be waived or modified.

After sitting through the meeting and reviewing the documents prepared by Lipari, Gorelick presented a list of items he wanted to review prior to deciding whether Dominion could proceed. He also indicated his belief that the loan transaction was not in a position to close, explaining that, in light of the unresolved title problems, problems with the leases, the unfulfilled status of some of the preclosing conditions and the inadequacy of the draft loan documents, he could not advise his client to proceed.

Gorelick gave the strong impression that the entire deal had to be overhauled. In giving this impression, Gorelick was less than tactful. He was particularly vehement about the inadequacy of the documents prepared by Lipari, which he described as "idiotic." To satisfy Gorelick's concerns, Queen City and Penthouse agreed to allow Gorelick and his firm to prepare appropriate closing documents and to review condition compliance in order to bring the deal to a close. Penthouse also agreed to pay the Melrod firm's fees while it focused its resources on the loan transaction.

After Penthouse and Queen City gave Gorelick and the Melrod firm responsibility for moving the deal toward closing, Gorelick immediately sought documents and information from Penthouse concerning all aspects of the transaction. Gorelick then drafted checklists of the documents and information he felt was necessary to review and communicated these checklists to Newman. Gorelick's checklists were very broad in scope and covered all facets of the hotel and casino project. Gorelick's initial requests for information regarding the transaction were communicated on February 9th, but were followed up by several additional requests later that month. Newman responded at length to these requests in letters dated February 29th and March 1st 1984.

Responsive to the problems with the Helmsley lease, Melrod lawyers prepared a list of proposed amendments to the Helmsley lease that they believed were necessary before closing. Gorelick insisted that Penthouse seek the proposed amendments from Helmsley and described each amendment as being "required." When, however, the proposed amendments were sent to Penthouse, they were accompanied by a cover letter from Gorelick's partner, Louis Trotter, that indicated that the proposed amendments reflected "a nearly final version of what the lender will be looking for and [would] certainly provide you with a jumping off point for your discussions with Helmsley."

To respond to an inquiry concerning the status of alternate licensing arrangements, which was required as a preclosing condition, Penthouse's attorney, Arthur S. Goldstein, sent the Melrod firm two letters. These letters addressed the status of Penthouse's license application and set forth the results of Goldstein's inquiries with the staff of the New Jersey Casino Control Commission ("CCC"). In the first letter, after providing an overview of the New Jersey Casino Control Act (the "act") and explaining in detail the license application process, Goldstein discussed the status of Penthouse's application. He stated that Penthouse had commenced the application process but that, at its request, the process had been suspended in September 1982 pending the outcome of Penthouse's efforts to obtain financing. As of February 1984, the application process had not been reactivated. Goldstein also explained that the financial institutions participating in the loan transaction would have to "qualify" under the act. Goldstein's prognosis as to the timing of licensing was that the whole process might be accomplished within a year.

More directly responsive to the status of the preclosing condition was Goldstein's second letter. The preclosing condition required that "reasonably satisfactory" arrangements be made with the staff of the CCC to permit the opening of the casino in the event that Penthouse did not obtain a license. In the second letter, Goldstein

stated that he had discussed the matter with staff members at the CCC, but he explained that they had no authority to make binding decisions and that it would be necessary for Penthouse to submit a formal proposal. Nevertheless, based upon his informal discussions with the CCC staff, Goldstein opined that if Penthouse became unlicenseable, it would be necessary for it to completely divest itself of any "beneficial interest" in the casino. He suggested that this could be accomplished by using a trustee who would buy out Penthouse's interest in the casino. He also stated that this transaction would have to be structured in such a manner to insure that Penthouse would have no recourse against the casino in the event of default. After Goldstein set forth additional details of the proposed trusteeship and the buy-out transaction, he concluded by stating that his comments only reflected a "rough outline of what I believe to be a proposal that might be acceptable to the Commission."

In addition to the document and information exchanges, Gorelick and representatives of Dominion engaged in a series of meetings with Myerson and, subsequently, Guccione. At one meeting held on February 29, 1984, Myerson met with Gorelick and other Melrod attorneys to discuss the progress toward closing. Gorelick indicated that he was still in the process of revising his closing checklists and that until he had finished that analysis there has not much to discuss. At that meeting or shortly thereafter, Gorelick reminded Myerson that, since the loan commitment would expire on March 1, 1984, Myerson should submit a request for an extension of the commitment expiration date. Myerson refused, however, to make such a request. Myerson believed that the loan commitment could not expire unless and until Penthouse was presented with the closing documents.

Later in the day on February 29th, Myerson went to Dominion's offices in McLean, Virginia where he met with Dominion's President, David Neal, and a representative of Community, William J. Wienke, Jr. Neal explained that Wienke was present at the meeting because Community was a participant in the loan. During the course of the meeting, the parties discussed various aspects of the project. At the conclusion, however, Wienke expressed his concern about the delays in closing and told Myerson that he needed more information about the loan. Wienke then presented Myerson with a list of thirty-five items concerning the transaction and explained that "this is the kind of stuff that I need." Myerson said that he would review the matters raised in Wienke's list.

Also on February 29th, Gorelick, Wienke and Neal engaged in a telephone conference call to discuss the transaction. During this telephone conference, Wienke explained that he was "getting a bad feeling" about the transaction and inquired whether the commitment should be terminated due to Penthouse's failure to satisfy the pre-closing conditions by the March 1st date. Gorelick advised against this and Wienke acquiesced.

In addition to Gorelick's work on the transaction, representatives of Dominion were sending information requests and other items to Penthouse directly. For example, on March 1, 1984, Dominion's Vice–President, James Winston Bray, sent Myerson a letter recapping the "areas of concern" which he felt "need[ed] particular attention." Bray stated that one matter he thought needed addressing—"to make the proposed financing for the project marketable"—was the existence of "[a] satisfactory management agreement, prior to loan closing, for the operation of the proposed hotel." Nevertheless, he prefaced his comments by stating that his concerns were not intended "to replace or diminish" the various other aspects of the loan transaction.

On March 6, 1984, Myerson met with Guccione and Dominion's Chairman of the Board, William L. Walde, at Guccione's home. Although Walde expressed Dominion's continued interest in financing the project, he raised concerns regarding Queen City's ability to serve as the lead lender for the transaction. Walde described Queen City as a small and inconsequential savings and loan and suggested

that it was ill-equipped to handle a transaction of this size. Guccione said that he would speak to Queen City about Walde's concerns, but he also stated that he thought it would be unfair to remove Queen City from the lead position.

On March 14, 1984, Guccione flew to Washington, D.C. to meet with Walde. At that meeting, Guccione told Walde that Queen City would not relinquish its lead position, but he offered to compensate Dominion for the fees that it otherwise would have earned had it been the lead lending institution. Also at this meeting, Walde informed Guccione that he wanted to appoint a construction company, Sigal, to perform a long in-depth reevaluation of the structure, the steel and all the parts thereon. Guccione explained that he thought that this was unnecessary. Walde also requested that Penthouse designate a specific individual at Penthouse whose sole responsibility would be to address matters of concern raised by Dominion in connection with the loan transaction.

On March 15, 1984, Walde followed up the meeting with Guccione by sending him a letter summarizing the issues discussed which Guccione had agreed "to look into." One of the items for review was that "[t]he hotel manager [was] to submit to lender a hotel management program." On March 22, 1984, Dominion's Neal sent a letter to Guccione recommending that Penthouse engage Sigal to formulate a construction cost evaluation. Neal concluded the letter by stating that he felt that "this project has been allowed to drift without direction entirely too long. I sincerely hope that you will implement our recommendations ... at the earliest possible time, the decision is, of course, entirely yours." Not long after the March 22nd letter, Penthouse broke off communications with Dominion and the Melrod firm and refused to respond to their telephone calls.

Beginning on March 20, 1984, the loan participation syndicate began to unravel. First, on March 20th, Community sent a letter to Dominion stating that it had "elected not to extend its offer to participate" in the loan. Then, on March 28,

1984, another participant, Shadow Lawn Savings & Loan Association, wrote to Queen City and indicated that in view of the fact that the loan commitment "has now expired" and because interest rates had changed, it had to meet with Queen City before it would "reconsider an extension" of its participation interest. In May and June 1984, several other participants sent notices to Queen City indicating their belief that the loan commitment had expired and that they were relieved of their participation commitments. Subsequently, after it was unsuccessful in obtaining alternate financing, Penthouse filed the instant action in June 1984.

## PROCEEDINGS IN THE DISTRICT COURT AND ITS DECISION

A brief review of the district court's docket sheet reveals that the instant litigation was hard fought with several discovery battles and other disagreements. The case proceeded to a bench trial on May 11, 1987 before Judge Duffy and concluded on June 1, 1987. A number of witnesses appeared for both sides and the record was supplemented by affidavits of witnesses who did not appear at trial.

Important to Dominion's defense to the anticipatory breach claim was its insistence that Penthouse was not in any position to close the loan by March 1st because it could not have satisfied various terms and preclosing conditions of the commitment by that time. To address this point, Dominion presented the testimony of an expert in real estate construction and permanent financing transactions, John C. Nelson, who was a partner in the New York City law firm of Milbank, Tweed, Hadley & McCloy. After setting forth the factual predicate upon which he based his opinion, Nelson opined that, in light of the various title problems (which were supported by the objections to title asserted by Commonwealth), the lack of agreements with certain utility companies, the absence of final plans and specifications, no final project budget, the lack of contracts with an architect, a major construction contractor and major trade contractors, and no agreement

concerning casino licensing, the transaction was in no position to close any time from 60 days to six months from the February 9th preclosing meeting. When Nelson presented his opinion at trial, however, the district court asked him how long it would take to close the transaction if all of the preclosing conditions he had taken into account when formulating his opinion (i.e., final plans and specifications, project budgets, trade contracts, etc.) had been waived. Nelson replied that the deal could close as soon as the papers were drawn up. He qualified his response, however, by insisting that a prudent lender would not waive the various conditions which the hypothetical question assumed were waived.

Also important to Dominion's case was the testimony of Melrod partner, Philip Gorelick. Because of his extensive involvement in the transaction, he was in the best position to present Dominion's perspective concerning the deal. The district court was not, however, receptive to Gorelick's testimony. After Gorelick had concluded his testimony on direct examination and began responding to questions on cross-examination, Judge Duffy called a morning recess. As the Judge was leaving the courtroom, he requested that the Melrod firm's attorney, Robert L. Tofel, join him in the robing room. When Tofel met Judge Duffy in the robing room, the judge handed him a copy of Volume 377 of the Federal Supplement and requested that Tofel read the first line in *United States v. Tramunti,* 377 F.Supp. 1 (S.D.N.Y.1974) (Duffy, J.). That line reads: "John Spurdis is a liar." After reading the sentence to himself, Tofel looked at the judge. Saying nothing, Judge Duffy simply shrugged expressively. Tofel then said in essence that Judge Duffy had misread Gorelick. Tofel explained that Gorelick may have been obnoxious or aggressive but that he was not a liar. Again, Judge Duffy did not respond and simply shrugged.

On July 29, 1987, the district court filed its reported decision in which it held in favor of Penthouse and Queen City and against Dominion. *See* 665 F.Supp. 301 (S.D.N.Y.1987). The district court held

that Dominion's conduct during February and March 1984 constituted an anticipatory breach of the loan commitment. The district court began its analysis by reasoning that a party to a contract commits an anticipatory breach when it "indicates its refusal to perform unless entirely new or different conditions are first met[.]" *Id.* at 310 (citations omitted). The district court then found that Dominion's conduct on at least four occasions gave rise to an anticipatory breach. Specifically, the court found that 1) Gorelick's demand that Penthouse obtain amendments to the Helmsley lease, 2) Dominion's insistence that a hotel management agreement be entered into prior to closing, 3) Dominion's insistence that Penthouse hire Sigal to perform a construction cost evaluation, and 4) Dominion's insistence that it replace Queen City as lead lender, taken together, "amounted to an unambiguous refusal to close by Dominion", *id.* at 311, and thus constituted an anticipatory breach.

In response to Dominion's argument that Penthouse was not in a position to satisfy the preclosing conditions before March 1st, the district court found that, by the February 9th preclosing meeting, "all of the conditions precedent had been met, waived, or were in a position to have been met by the date set for closing the loan." *Id.* at 310. The district court specifically found 1) that the title and lease problems were "minor" and could be worked out during the "ongoing" discussions with Helmsley, 2) that Queen City had waived Penthouse's full compliance with preclosing conditions 10, 11, 12, and 16; 3) that Penthouse had satisfied preclosing condition 13, and 4) that arrangements with the Casino Control Commission were "easily within reach." *See id.* at 304–05, 310. The court failed to make factual findings or legal conclusions establishing Queen City's authority to waive any preclosing conditions on behalf of Dominion.

The district court explored Dominion's motive for committing the anticipatory breach and found that "[b]ecause of Community's withdrawal on February 29, ... Dominion either had to stall the closing

until the loan expired and then withdraw from its commitment, or breach its agreement." *Id.* at 310. According to the district court, Gorelick was employed to serve as "Dominion's hatchet man intent on destroying the deal," *id.* at 308, that "Dominion hired Gorelick to bully and intimidate the plaintiffs into delaying the loan until Community could be replaced or[,] failing that, to delay until the Commitment expired and Dominion was released from its obligation." *Id.* at 307.

The district court also carried forward its earlier, private attack on Gorelick's veracity. In its decision, the district court found that Gorelick committed "outrageous perjury" during trial. *Id.* at 306–07. Making reference to Gorelick's trial testimony, the district court stated

> [t]he decision as to the credibility of witnesses is properly left to the trial judge or to the jury because as finders of fact they are in a position to view the demeanor of the witnesses.

> Gorelick took the stand and attempted brazenly to lie to the court. During cross-examination, the crucible of truth, Gorelick continuously shifted uneasily in the chair, sweated like a trapped liar, and the glaze that came over his shifty eyes gave proof to his continuing perjury. His total lack of veracity was shown not only by his demeanor but by the shady practices he seemingly reveled in. He charged needless and exorbitant fees, Joint Exh. 41, for work that was intentionally unproductive. While representing the bank he demanded a $150,000 "bonus" from the borrower if the loan closed, an arrangement Gorelick never disclosed to his bank-client.

*Id.* at 306 n. 1. Thus, the court made a specific factual finding that Gorelick committed perjury during his trial testimony.

After reaching its decision on the liability issue, the district court considered the damage question. The court first determined that Penthouse was entitled to various out-of-pocket and "carrying" expenses. Then, the court turned to the question of whether Penthouse was entitled to recover the profits it would have made had the construction

been completed and the hotel and casino become operational. Applying the rationale of *Perma Research & Development v. Singer Co.*, 542 F.2d 111 (2d Cir.1976), the court determined that Penthouse's lost future profits over a ten-year period could be properly awarded. Accordingly, the district court held that Penthouse was entitled to recover damages in the amount of $129,-904,455, $112,083,583 of which was for the lost future profits.

Also in its decision, the district court concluded that Queen City should prevail on its counterclaim in the third-party action: "Having held that Dominion breached its agreement, I must also find it liable to Queen City for that breach." 665 F.Supp. at 312. In addition, the court concluded that Dominion should lose on its third-party claim against Queen City because "[t]here [was] a total failure of proof that Queen City breached any duty owed to Dominion." *Id.*

After the court issued its opinion, Penthouse submitted its proposed judgment to the district court. In the proposed judgment, Penthouse did not name the Melrod firm as a judgment-debtor for the lost profits award. To correct what it perceived as a discrepancy, the district court *sua sponte* conformed the pleadings to the proof and held that the Melrod firm was jointly and severally liable for the entire Penthouse judgment. The court explained that the Melrod firm was liable for the Penthouse judgment because its conduct amounted to active fraud. The district court did not, however, make any factual findings concerning what acts or omissions allegedly perpetrated by the Melrod firm gave rise to the court's conclusion that it committed fraud. Nor did the court explain how a judgment for lost profits which resulted from an alleged anticipatory breach of a loan commitment could also serve as the basis for a fraud judgment.

After amending its original decision, the district court entered final judgment on October 2, 1987 and awarded Penthouse $128,682,830.80, held Dominion and the Melrod firm jointly and severally liable for that judgment, awarded Queen City

$7,652,352.91 plus interest and dismissed Dominion's claim against Queen City with prejudice. Subsequently, in a memorandum and order dated December 2, 1987, the district court denied the defendants' motion for a new trial. 678 F.Supp. 61.

## DISCUSSION

Dominion and the Melrod firm raise several arguments on this appeal. Dominion contends that the district court erred in concluding that its conduct amounted to an anticipatory breach of the loan commitment and that the court erred in concluding that Penthouse was ready, willing and able to perform its obligations under the loan commitment. Dominion also argues that the district court applied an incorrect legal standard when it awarded Penthouse damages for its lost future profits and that the court erred when it dismissed its claim against Queen City. The Melrod firm challenges the judgment entered against it on fraud grounds, arguing, inter alia, that because such a finding was not supported in law or fact, the district court erred in sua sponte holding Melrod jointly and severally liable for the Penthouse judgment.

For the reasons that follow, we reverse the judgments entered in favor of Penthouse and Queen City, affirm the dismissal of Dominion's cross-claim and remand with instructions that judgment be entered in favor of Dominion and the Melrod firm.

## I. DOMINION'S APPEAL OF PENTHOUSE JUDGMENT

### A. *Preliminary matters.*

■ At the outset, Dominion argues that the loan commitment expired by its own terms on March 1, 1984 and contends that, after that date, Dominion, Queen City and the other participating lenders were under "no further obligation" to proceed with the mortgage financing. Dominion therefore suggests that the March 1st date has crucial significance in part because it would constitute the date on or before which the parties would have been required to perform and/or satisfy their obligations under the loan commitment.

At the November 21st meeting, the parties understood that the commitment had expired by its own terms. A written extension of the expiration date was therefore necessary to have a "valid" commitment as of the date Dominion agreed to participate. The parties then mutually extended the expiration date to December 1, 1983, but they simultaneously agreed that the "closing date" for the loan would occur "no earlier than February 1, 1984 or later than March 1, 1984." Aside from these agreements, the parties entered into no other arrangements with respect to further extensions of the expiration date or the closing date.

"An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose." *Tessmar v. Grosner,* 23 N.J. 193, 128 A.2d 467, 471 (1957) (citations omitted). While courts must accord an agreement "the most fair and reasonable construction, imputing the least hardship on either of the contracting parties ... so that neither will have an unfair or unreasonable advantage over the other[,]" *id.* (citations omitted), "[w]here no ambiguity exists in a contract it is the duty of the court, as a matter of law, to interpret the same ... [and] where the parties have said, by very plain words, what they meant, the court has no duty to perform other than to carry their meaning into effect." *Korb v. Spray Beach Hotel Co.,* 24 N.J.Super. 151, 93 A.2d 578, 580 (1952) (per curiam) (citations omitted). In the guise of construing the terms of an agreement, "court[s] will not make a different or better contract than the parties themselves have seen fit to enter into[.]" *In the Matter of the Community Medical Center,* 623 F.2d 864, 866 (3d Cir.1980) (citing *Washington Construction Co. v. Spinella,* 8 N.J. 212, 217–18, 84 A.2d 617, 619 (1951)).

The loan commitment provisions concerning the expriation date and closing date are unambiguous. The loan commitment expired by its own terms 120 days after it was issued on June 20, 1983 unless the parties mutually extended it in writing.

After the expiration date passed, the commitment clearly provided that the lender would be under "no further obligation" to fund the loan. It also provided that the closing had to occur on or before the expiration date. The parties' conduct in connection with the written extension to December 1st clearly reflected their belief that the expiration clause was self-executing and that the loan commitment could expire by its own terms.

What we must resolve is whether, when the parties agreed to close the loan "no later than March 1, 1984", they intended on extending the expiration date to March 1st. We believe they did. Reading the expiration date clause together with the clause regarding the closing date leads us to conclude that the parties must have intended to extend the expiration date when they agreed that the closing would occur no later than March 1st. Any other construction of these documents would leave the parties agreeing to close the loan after the commitment had expired which would make no sense.

Some participants clearly believed that when Penthouse and Queen City agreed that the closing date would be "no later than" March 1st, this had the effect of extending the expiration date to that date. Thus, when Community, Shadow Lawn and other participants withdrew their commitments, they all based their decisions upon the fact that the commitment expired on March 1st. In addition, Gorelick and Wienke both believed that the loan commitment expired on that date. Indeed, Gorelick brought the problem of the March 1st expiration to Myerson's attention when he suggested that Myerson obtain an extension of the expiration date. Finally, and most importantly, even Penthouse has acknowledged, albeit indirectly, that the commitment was in effect only until March 1, 1984. Thus, in paragraph 7 of Penthouse's complaint, it alleged as a fact that "[t]he loan commitment was scheduled, by its terms, to remain in effect for 120 days after issuance, and was subsequently extended to March 1, 1984." A necessary inference from this allegation is that Penthouse did not believe that the commitment was extended past March 1st.

The district court did not specifically find that the parties extended the expiration date to March 1st, but it did find that the parties had set March 1st as the closing date. Thus, when the district court was reviewing Penthouse's ability to resolve the title problems, it found "that the entire matter could have been resolved in time to close the deal before March 1, 1984." 665 F.Supp. at 305. Although the district court could have been more deliberate by specifically holding that March 1st was the closing date, we are satisfied that it found that March 1st was the date set for closing.

In view of the above, we conclude that not only was March 1st the closing date, but also that the commitment expired on that date. We acknowledge that the parties' conduct in continuing to negotiate after March 1st may be consistent with an implied extension of the expiration date. We observe, however, that Penthouse and Queen City had allowed the commitment to expire by its own terms once before. Thus, we do not believe that our conclusion here is at odds with the parties' expectations. In holding that the commitment expired on March 1st, we simply construe the terms of relatively unambiguous documents. The parties bargained for a loan commitment that remained open only for a stated duration and we are not at liberty to construe that agreement in a manner inconsistent with its clear language.

B. *Existence of an anticipatory breach.*

We now turn to the district court's factual findings and legal conclusions concerning the existence of an anticipatory breach. The district court determined that "Dominion's representatives' conduct and statements amounted to a clear refusal to proceed to closing unless conditions beyond those required by the Loan Commitment were first met." 665 F.Supp. at 310. As examples of Dominion's "clear refusal to proceed," the district court relied on 1) Gorelick's insistence on the proposed amendments to the Helmsley Lease, 2) Do-

minion's alleged insistence that a hotel management agreement be in place prior to closing, 3) Dominion's alleged requirement that Penthouse hire Sigal, and 4) Dominion's alleged demand that it replace Queen City as lead lender. Pointing out that three of the four examples the district court took into account when it found that an anticipatory breach occurred all took place after March 1st, Dominion argues that the district court erred as a matter of law by considering Dominion's post-March 1st conduct. In addition, Dominion contends that, when only its pre-March 1st conduct is taken into account, it is clear that it did not by word or conduct commit an anticipatory breach. We agree.

"Ordinarily no action for damages or for restitution can be maintained until the time for performance has come and there has been an actual failure to perform." *Miller & Sons Bakery Co. v. Selikowitz,* 8 N.J.Super. 118, 73 A.2d 607, 609 (1950). Nevertheless, "where ... one party [to a contract] either disables himself from performing, or prevents the other from performing, or repudiates in advance his obligations under the contract, and refuses to be longer bound thereby, communicating such repudiation to the other party," the non-breaching party "is not only excused from further performance ..., but may at his option treat the contract as terminated for all purposes of performance, and maintain an action at once for damages occasioned by such repudiation, without awaiting the time fixed by the contract for performance by the defendant." *Dun & Bradstreet, Inc. v. Wilsonite Products Co.,* 130 N.J.L. 24, 31 A.2d 45, 47 (1943) (quoting *O'Neill v. Supreme Council American Legion of Honor,* 70 N.J.L. 410, 412, 57 A. 463, 464 (1904)).

"An anticipatory breach is a definite and unconditional declaration by a party to an executory contract—through word or conduct—that he will not or cannot render the agreed upon performance." *Ross Systems v. Linden Dari–Delite, Inc.,* 35 N.J. 329, 173 A.2d 258, 264 (1961) (citations omitted). Likewise, "[i]f one party to a contract, either wilfully or by mistake, demands of the other a performance to which he has no

right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed." 4 A. Corbin, Corbin on Contracts § 973, p. 910 (1951).

The term anticipatory breach is self-defining as one which occurs before the time of performance and while the contract is in existence. As we concluded above, March 1st was the closing date and the expiration date for this loan transaction. Thus, we are compelled to agree with Dominion's argument that the district court erred as a matter of law when it took into account Dominion's post-March 1st conduct when determining the existence of an anticipatory breach. Only Dominion's conduct before March 1st is relevant to the determination of whether an anticipatory breach has occurred, and taking only that conduct into account, we conclude that the district court clearly erred when it found that Dominion committed an anticipatory breach.

New Jersey adheres to the view that an anticipatory breach occurs only if there is a *"clear and unequivocal declaration"* that "the agreed upon performance would not be forthcoming." *Seitz v. Mark–O–Lite Sign Contractors, Inc.,* 210 N.J.Super. 646, 510 A.2d 319, 324 (1986) (emphasis added); *see Ross Systems Inc.,* 35 N.J. 329, 173 A.2d at 264; *Miller & Sons Bakery Co.,* 8 N.J.Super. 118, 73 A.2d at 609; *see generally* 4 A. Corbin, Corbin on Contracts § 973 (1951). "Doubtful and indefinite statements that performance may or may not take place and statements that, under certain circumstances that in fact do not yet exist, the performance will not take place," will not give rise to a claim for anticipatory breach. 4 A. Corbin, Corbin on Contracts § 973, p. 905 (1951) (footnote omitted).

 In recounting the evidence concerning Gorelick's conduct at the February 9, 1984 preclosing meeting, the district court found that "[t]he overwhelming evidence shows that Gorelick's demands were equal to a demand that the deal be completely done over[.]" 665 F.Supp. at 307. Subsequently, the court found that

"[t]hroughout February *and March*, Dominion, through the Melrod firm, continued to make requests for more information which Newman described as 'never ending.' ... Dominion further demanded numerous changes in the way the entire deal was to be structured, the parties involved, and other changes not required by the Loan Commitment." *Id.* at 309. When, however, the court sought to provide specific examples of the "changes not required" by the commitment, the only one that occurred before March 1st was Gorelick's demands concerning amendments to the Helmsley lease. The evidence established that Gorelick did in fact insist that the proposed amendments were "required." Thus, the issue we confront is whether Gorelick's insistence on the proposed amendments represented a demand for performance for which Dominion had no right and whether his insistence amounted to a "definite and unequivocal refusal" by Dominion to fulfill its obligations under the agreement unless this condition was met.

It is undisputed that, unless amended, the Helmsley lease would have been violated by the closing of the Queen City deal. Because the loan commitment required that there be "no violations" of that lease at closing, it is clear that some amendments were necessary to satisfy the terms of the loan commitment. To this end, the Melrod lawyers submitted a list of proposed amendments to Penthouse. Even though Gorelick insisted that each proposed amendment was required, when the proposed amendments were sent to Penthouse, Dominion's position was equivocal. Trotter's cover letter indicated that the amendments represented what Dominion would be "looking for" and would provide Penthouse "with a jumping off point" for its negotiations with Helmsley. Thus, Gorelick's statements that the proposed amendments were required clearly were qualified by the statements made in Trotter's cover letter.

In addition, we observe that the list of proposed amendments was just that—a proposal. With the proposed amendments, it was contemplated that Penthouse would then engage in negotiations with Helmsley.

As indicated in Trotter's letter, the proposed amendments constituted a starting point for the negotiations with Helmsley, but they did not represent Dominion's "final" position. Viewed in this light, we are persuaded that the district court clearly erred when it found that Gorelick's insistence on the proposed amendments gave rise to an anticipatory breach. New Jersey consistently requires that the breaching party in these cases make a "clear and unequivocal declaration" that performance would not be forthcoming and Gorelick's conduct in this regard falls short.

Nevertheless, we are left with the court's general finding that Dominion refused to perform unless the entire deal was restructured. As pointed out above, most of the specific instances of conduct cited by the court occurred after March 1st and thus are not relevant to our inquiry. We do confront, however, the district court's finding that Gorelick demanded at the February 9th meeting that everything in connection with the deal be "completely done over." We observe that Gorelick was so adamant in this regard that the parties allowed him to assume responsibility for drafting the closing documents and reviewing condition compliance. Thus, it is arguable that his demands at the February 9th meeting were sufficiently clear and unequivocal to give rise to an anticipatory breach if his refusal to proceed was unjustified.

When Gorelick attended the February 9th meeting, he only recently had been brought into the deal. He was there to represent his client's interests in connection with its agreement to participate in a $97 million construction and permanent financing transaction, of which more than a third was to be funded by his client. At the time of the preclosing meeting, the parties contemplated closing the transaction within a few weeks—by March 1st at the latest. At the meeting or shortly before, Gorelick discovered that there were significant problems affecting title and problems with the Helmsley lease and yet there were no active negotiations to resolve those problems. Gorelick also learned that

Queen City intended on closing the transaction without insisting that Penthouse comply fully with all of the preclosing conditions. In addition, he received draft loan documentation which, in his judgment, was amateurish and substandard for a transaction of this magnitude.

While we do not pass upon the reasonableness of each of Gorelick's objections, we note that Nelson's expert testimony fully supported Gorelick's position that the transaction was not in a position to close any time in the near future. We also note that although the district court found that some of Gorelick's objections were unreasonable, it did not find that most of his concerns were unfounded. Gorelick attended the preclosing meeting in order to ensure that the interests of his client were protected. In so doing, he insightfully observed serious problems with the transaction and promptly raised his objections. Gorelick's insistence on marketable title in the face of the objections reported by the title company all by itself would justify his position that the deal was in no position to close and thus cannot, as a matter of law, constitute an anticipatory breach. Coupling the title and lease problems with Penthouse's failure to establish that it was in a position to fully satisfy all of the preclosing conditions, we conclude that Gorelick properly refused to proceed unless his concerns were addressed. We therefore conclude that the district court clearly erred when it found that Dominion committed an anticipatory breach of its agreement to participate. Accordingly, we reverse the judgment entered against Dominion.

## C. *Plaintiffs' ability to perform.*

 As part of this damages action for an alleged anticipatory breach, Penthouse bore the burden of establishing its willingness and ability to perform all of the obligations under the agreement. As Professor Corbin has explained,

*[i]n an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions.* If he could not or would not

have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant's repudiation, is willingness and ability to perform if there had been no repudiation.

4 A. Corbin, Corbin on Contracts § 978, pp. 924–25 (1951) (emphasis added) (footnote omitted). New Jersey follows this general rule. *See Bertrand v. Jones,* 58 N.J.Super. 273, 156 A.2d 161, 168 (App.Div.1959) (following Corbin), *certif. denied,* 31 N.J. 553, 158 A.2d 452 (1960); *cf. Caporale v. Rubine,* 92 N.J.L. 463, 105 A. 226, 227 (1918) (in breach of contract action for damages, plaintiff has the burden of establishing "that he was able and ready to perform his part of the undertaking"); *accord Korb,* 24 N.J.Super. 151, 93 A.2d at 581 (in an action for specific performance, plaintiff must establish that he is "ready, desirous, prompt and eager to perform the contract on his part").

That the plaintiff must establish its readiness and ability to perform does not mean that it is required to tender performance. After the occurrence of an anticipatory breach, "[i]t is no longer necessary for the plaintiff to perform or tender performance." 4 A. Corbin, Corbin on Contracts § 977, p. 920 (1951) (footnote omitted); *see Dun & Bradstreet,* 130 N.J.L. 24, 31 A.2d at 47. This is so because "[t]he defendant's wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible." 4 A. Corbin, Corbin on Contracts § 978, p. 925 (1951). Nevertheless, the plaintiff must demonstrate that it had the willingness and ability to perform "before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated." *Id.*

 In the instant case, the district court found that "at the time of the preclosing meeting, all of the conditions precedent had

been met, waived, or were in a position to have been met by the date set for closing the loan." 665 F.Supp. at 310. Thus, it found that Penthouse was ready, willing and able to proceed by the time of the alleged anticipatory breach. In challenging this conclusion, Dominion argues that Penthouse had not met and could not have met its obligations to convey valid mortgages and to satisfy certain of the preclosing conditions and that the district court's findings in this regard are clearly erroneous. Dominion also argues that the district court erred in concluding that certain conditions had been waived, contending that Queen City had no authority to waive preclosing conditions. Dominion concludes that, when properly viewed, the evidence demonstrates that Penthouse was in no position to satisfy the preclosing conditions on or before March 1st and thus failed to establish that it was ready, willing and able to proceed. We agree.

Despite the fact that Penthouse and Queen City never argued at trial that any of the preclosing conditions had been waived, the district court determined that Penthouse's full compliance with preclosing conditions 10, 11, 12 and 16 had been waived as a result of Lipari's meetings with Penthouse during the January 1984 status conferences. The district court's waiver finding was integral to its determination that Penthouse was ready, willing and able to perform by the closing date because, in the absence of a waiver, it is clear that those material preclosing conditions were not and could not have been satisfied by March 1st. Penthouse offered at trial no evidence to contradict Nelson's opinion that it would have taken at least 60 days, and more than likely 6 months, from February 9, 1984 for Penthouse to comply with all of the preclosing conditions. Nelson's prognosis changed only after the district court inquired as to how long it would have taken to close if the unsatisfied preclosing conditions had been waived. Although he bristled at the suggestion that those preclosing conditions would ever be waived by a prudent lender—let alone an institutional lender—he testified that, assuming a waiver, the loan could have been

closed as soon as the papers were drawn up. In the face of this testimony, we must squarely decide the propriety of the district court's waiver finding. This inquiry requires, in turn, that we examine whether Queen City had the authority in the first instance to waive Penthouse's compliance with preclosing conditions. We conclude that it did not.

Before we inquire into Queen City's authority to waive compliance with preclosing conditions, we must examine the nature of Dominion's agreement to participate. On November 21st, Dominion entered into an agreement with Queen City whereby it agreed to participate in the lending syndicate to the extent of $35 million. That agreement was embodied in several documents which, in turn, incorporated the terms and conditions of *both* the Queen City loan commitment and the participation agreement. When construing Dominion's agreement, we read these documents "together as one instrument, and the recitals in one may be explained or limited by reference to the other." *Schlein v. Gairoard*, 127 N.J.L. 358, 22 A.2d 539, 540–41 (1941); *see Schlossman's, Inc. v. Radcliffe*, 3 N.J. 430, 70 A.2d 493, 495 (1950). Applying this rule, we therefore look to the terms of both the loan commitment and the participation agreement when examining whether Queen City had the authority to effect a waiver of preclosing conditions.

The loan commitment provided that "[a]ll title questions and all other legal matters relating to or arising out of the Loan shall be subject in all respects to the approval of the Lender's counsel ... and the decision of the Lender's counsel as to whether all conditions of the commitment have been met shall be final." The commitment also provided, however, that "[l]ender's obligation to close the loan is contingent upon the satisfaction of each of [the preclosing] conditions." Reading these two provisions together, we conclude that, although Queen City had the final word on whether the preclosing conditions had been satisfied, Penthouse nevertheless was required to satisfy each of the preclosing conditions. Thus, Queen City was granted essentially

administrative authority to oversee the manner in which the preclosing conditions were satisfied, but it was not empowered to waive Penthouse's compliance with the preclosing conditions.

The participation agreement further limited Queen City's authority in connection with the administration of the loan transaction. It expressly provided that its terms could not be modified except by an agreement in writing. Thus, Queen City was not empowered to modify the terms or conditions of the participation agreement without obtaining the participants' prior approval. In addition, when the participants entered into the agreement with Queen City, they only authorized Queen City to act on their behalf in the capacity of an independent contractor; Queen City was not authorized to act as their agent. To this end, Queen City was given discretionary power as to the means and manner of contractual performance, see, e.g., Errickson v. F.W. Schwiers, Jr. Co., 108 N.J.L. 481, 158 A. 482, 483 (1932), but was not empowered to make material changes that rendered the participants less secure. Even if we were to conclude that Queen City was authorized to act as agent for the participants, it would not have been empowered to waive or alter material terms "or otherwise to diminish or discharge the obligation of the third person[.]" See Restatement (Second) of Agency § 51 comment C (2d ed. 1979).

In view of the above, it is clear that Queen City was not authorized expressly or inferentially in the commitment or the participation agreement to modify the terms of the commitment by waiving Penthouse's full compliance with preclosing conditions. In addition, when Dominion was first informed concerning the full extent of Penthouse's proposed substitute performance for preclosing conditions 10, 11, 12 and 16, Gorelick objected. Then, after the Melrod firm was given responsibility for reviewing condition compliance and Gorelick transmitted his various checklists, it was made clear that Dominion expected that Penthouse would comply with the terms of each preclosing condition. Thus, there could be no implied waiver of these conditions here,

either. We therefore conclude that the district court erred when it found that Queen City waived Penthouse's full compliance with preclosing conditions 10, 11, 12 and 16. Because Queen City could not waive these conditions in the first place, it could not accept Penthouse's substitute performance without first obtaining the participants' approval.

Sound national banking policies support the conclusion we reach here. As *amicus curiae* Federal Home Loan Bank Board points out:

> the proposition ... that a lead lender may, without consulting participating lenders, waive or modify significant conditions of a loan to the detriment of participants, seriously undermines the Bank Board's supervisory policies concerning safe and sound underwriting of participation purchases and is completely at odds with the Bank Board's policy that loan participants must satisfy themselves that the participation is a loan that the participating association would make itself.

> If a lead lender has this authority ..., the Bank Board's supervisory control regarding underwriting of participation purchases is rendered more difficult or impossible and the FSLIC fund is exposed to inordinate risk. A savings and loan association's independently and prudently underwritten participation in a loan could be changed into an entirely reckless act if fundamental terms and conditions of the loan are altered prior to closing by the lead lender on its own initiative and without consulting the participant. This would make it very difficult, if not impossible, for a participant to assure prudent underwriting or participations.

While we do not necessarily find that these policy considerations by themself are binding if the parties had agreed otherwise, they certainly militate against the district court's unsubstantiated and erroneous finding that Queen City had the authority to waive various essential preclosing conditions.

As a separate matter, Dominion contends that the district court's other findings that bore upon Penthouse's ability to perform were erroneous. The district court found that the outstanding title and lease problems were "minor," 665 F.Supp. at 310, and that "the entire matter could have been resolved in time to close the deal before March 1, 1984." *Id.* at 305. The district court also held that, although licensing discussions with the Casino Control Commission "were to resume after the closing, ... it appeared an arrangement with the Commission was easily within reach." *Id.* Dominion argues that, notwithstanding the court's characterization, the title and lease problems were not minor and that there was no evidence to support the court's conclusion that those matters could have been resolved by March 1st. With regard to its finding concerning the licensing arrangements, Dominion contends that it supports the view that Penthouse could not have satisfied this preclosing condition before closing and that the court's characterization that these arrangements were "easily within reach" is belied by the evidence. We agree with both of Dominion's contentions.

Turning to the court's findings concerning the title and lease problems, we are compelled to conclude that the district court clearly erred when it characterized these matter's as being "minor." Unless these problems were resolved, they absolutely would have prevented Penthouse from delivering the title required in the commitment. Likewise, unless the Helmsley lease was modified, Penthouse could not certify that there were "no violations" of that lease. Thus, in view of the gravity of these problems, Penthouse knew that they had to be resolved by the closing date. We therefore cannot conclude that they were "minor."

In addition, the district court's characterization of the title and lease problems as "minor" presupposed that several contingencies could and would occur to resolve them before closing. As Nelson described the situation, since Helmsley was a sophisticated participant in real estate transactions, there probably would be no insur-

mountable barriers to reaching an accord with him to address the title and lease problems, "but it would take time and probably money." Thus, the court may have believed that the problems were minor because they could have been resolved in time and with money. To reach an agreement resolving these problems, however, it was incumbent upon Penthouse to commence negotiations. Thus, the district court's conclusion that these matters were minor and resolvable by March 1st rested on the assumption that negotiations with Helmsley were "ongoing" and would be concluded favorably before March 1st. This assumption was erroneous.

Both Myerson and Newman testified that actual negotiations with Helmsley had not occurred by February 9th. Although Newman had made indirect contact with Helmsley's attorney, no formal proposals had been submitted and no negotiations had begun. This uncontradicted evidence leads us to conclude that the district court clearly erred when it found that negotiations with Helmsley were "ongoing." Negotiations cannot be characterized as "ongoing" when they have not even begun. The absence of ongoing negotiations undermines the district court's finding that the title and lease problems could have been resolved before March 1st, and no evidence in the record indicates that negotiations would have commenced by March 1st, let alone be concluded by that date, to resolve the problems with the lease and title.

In addition, Penthouse failed to establish that it was working toward clearing up the problems posed by the McShane and Chase mortgages. Those mortgages had to be subordinated in order for Penthouse to provide the security required by the commitment and Penthouse apparently had not even made contact with the holders of those mortgages. This fact plus the problems surrounding the Helmsley lease lead us to conclude that the district court's factual finding that these problems could have been resolved by March 1st is clearly erroneous.

With regard to the court's finding concerning the status of the alternate licens-

ing arrangements condition, we note that the district court overlooked the fact that this was a *preclosing* condition. Because the court found that those arrangements could have been made *after* closing, it is clear that Penthouse did not carry its burden to demonstrate its ability to perform this condition *before* closing. In addition, we observe that record evidence does not support the district court's finding that these arrangements were "easily within reach." Goldstein's letter clearly indicated the tentative nature of his proposal. He described it as a "rough outline" of what he thought "might be acceptable" to the CCC. From Goldstein's letter, it is clear that no arrangements had actually been made. Presumably, Penthouse and the lenders were going to have to draft agreements for the alternate licensing arrangements. This would take time. Therefore, due to the tentative status of the proposed alternate arrangements and the absence of an actual agreement, we are convinced that the district court also erred in this regard.

In view of the foregoing, we conclude that Penthouse failed to carry its burden at trial to demonstrate that it was ready, willing and able to perform its contractual obligations at any time before March 1st. Thus, even if we were to agree that Dominion had refused to perform, we would nevertheless be compelled to conclude that it could not recover damages. We could conclude that Penthouse's failure to demonstrate that it could deliver marketable title by March 1st would be a complete answer to a charge of anticipatory breach. When, however, the title and lease problems are combined with Penthouse's inability to perform the various preclosing conditions, we are left with the firm belief that it should not be entitled to recover on its complaint for an anticipatory breach. Accordingly, the judgment in favor of Penthouse is reversed.

### D. *Damages.*

Having found that Penthouse failed to establish the essential elements of its anticipatory breach claim, we need not address the merits of the district court's award of lost future profits. Nevertheless, we are compelled to point out that the case upon which the district court relied when holding that the lost profits were recoverable may not be good law. In reaching its decision on the damages issue, the court relied on our decision in *Perma Research & Development v. Singer Co.*, 542 F.2d 111 (2d Cir.1976), a diversity action involving questions of New York law. Since our decision in *Perma Research*, however, New York's highest court has considered the damages issue decided in *Perma Research* and has flatly rejected the rationale of that decision. *See Kenford Co. v. Erie County*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (per curiam). In view of the New York Court of Appeal's decision in *Kenford*, the rationale of our decision on the damages issue in *Perma Research* is seriously in doubt and we conclude that the district court's reliance on that case was misplaced.

## II. DOMINION'S APPEAL OF QUEEN CITY JUDGMENT

### A. *Anticipatory breach claim.*

After it concluded that Dominion was liable to Penthouse for Dominion's alleged anticipatory breach, the district court addressed Queen City's claim, stating:

> Queen City counterclaims against Dominion for breach of its obligations to Queen City. As a direct result of Dominion's failure to close the loan, Queen City claims to have suffered a loss of profits it otherwise would have earned. In one of the documents signed November 21, 1983 Dominion accepted the Queen City commitment ..., and thus, Dominion's breach gives rise to claims by all parties to which it was contractually obligated. Having held that Dominion breached its agreement, I must also find it liable to Queen City for that breach.

665 F.Supp. at 312. Thus, when the district court held in favor of Queen City on the counterclaim, the court based its decision solely upon its earlier conclusion that Dominion committed an anticipatory breach. In view of our determination that the court erred in concluding that Domin-

ion committed an anticipatory breach and that Penthouse was ready, willing and able to proceed by March 1st, we reverse the judgment entered in favor of Queen City. Because Dominion's conduct did not amount to an anticipatory breach, it is not liable to Queen City on the counterclaim. Likewise, because Penthouse did not establish that it could have satisfied the preclosing conditions before March 1st, Queen City is also precluded from recovery against Dominion.

### B. Dismissal of Dominion's cross-claim.

Dominion contends that the district court erred when it dismissed with prejudice its third-party claim against Queen City. Dominion predicated its theory of Queen City's liability on the argument that, if Queen City did in fact waive four preclosing conditions, in so doing it breached its fiduciary duties owed to Dominion and the other participants. Because, however, we conclude that no waiver occurred—because Queen City had no authority to waive conditions—it follows that Queen City is not liable for any purported waiver. Accordingly, we affirm the district court's dismissal of this claim.

### III. THE MELROD FIRM'S APPEAL OF PENTHOUSE JUDGMENT

#### A. Background.

Nowhere in the district court's reported opinion did it find that Dominion or the Melrod firm committed fraud. The entire decision was devoted to a discussion of Dominion's alleged anticipatory breach and the damages resulting therefrom. There was no suggestion that Gorelick and the Melrod firm were to be held liable for the Penthouse judgment. In addition, while the district court made findings concerning Dominion's alleged undisclosed intent and Gorelick's purported role as "hatchet man," we observe that the court found no fraud or misrepresentation concerning the November 21st agreement and made no other specific findings with regard to subsequent events or statements suggesting that fraud was committed. Indeed, although Penthouse specifically sought in the pretrial

order a finding that its agreement to pay the Melrod firm's fees was void and unenforceable (a claim that was part of the fraud count in its complaint), the district court never made such a finding.

After the district court issued its reported decision, the parties submitted proposed judgments. Penthouse's proposed judgment form requested from the Melrod firm approximately $1.7 million, not the $128.7 million amount of its anticipatory breach judgment. In contrast, in addition to submitting its proposed judgment, the Melrod firm submitted a letter to the court in which it argued that it had been exonerated and should be free of liability. In response to these two conflicting proposed judgments, the district court filed an order dated September 30, 1987, in which it held the Melrod firm jointly and severally liable for the $128.7 million Penthouse judgment. Explaining its rationale for this decision, the district court stated:

> It is urged that the law partnership was merely an agent for a disclosed principal and as such could not be liable for any wrongdoing. This argument ignores two items: first, the firm did not disclose the true nature of the agency which it undertook; and, the actions of the firm through its partner constituted active fraud. The analogy that comes to mind when considering the law firm's argument is that of a hoodlum enforcer for a loan shark claiming innocence as the agent of a disclosed principal. In this case the Melrod firm did not disclose the true nature of its agency, i.e., to scuttle the deal and cause damage to the plaintiffs and others. Certainly no one can imagine Philip Gorelick coming to the pre-closing meeting to tell everyone that he had been delegated to subvert the deal.

> For some unexplained reason the various judgments submitted do not name the Melrod firm as a judgment debtor for the lost profits. This may be occasioned because of a defect in the pleadings at the start of the trial. As part of the pro forma disposition of the "usual motions" made at the end of the case, I granted

the "usual" motion to conform the pleadings to the proof. Thus it is appropriate and just for the Melrod firm to stand as a joint and several debtor for the profits lost by the Penthouse plaintiffs.

Notwithstanding the district court's assertions, no motions—"usual" or otherwise—to conform the pleadings to the proof appear in the record.

Thereafter, the Melrod firm filed a motion for a new trial in which it argued *inter alia* that the robing room incident, the court's bias against Gorelick and its *sua sponte* order holding the Melrod firm jointly and severally liable on a fraud theory all constituted reversible error and merited a new trial. In an order dated December 2, 1987, the district court denied the Melrod firm's motion. In that order, the court first concluded that it had not prejudged the case against the Melrod firm and had treated Gorelick appropriately, and then, turning to its *sua sponte* order, the court stated:

> [t]he last item raised in this motion for a new trial is a claim by the Melrod law firm that it was denied a fair trial because after the trial was finished I deemed the pleadings amended to make them responsible for all of the damages rather than the approximately $3 million for which they originally thought that they were potentially liable. Like the others, this claim also lacks substance. Somehow the Melrod firm claims that they were unprepared to defend against such a large claim. This ignores the fact that both Melrod and Dominion had but one counsel and he was totally prepared. Loss of the case by defense counsel cannot be attributed to anything other than the fact that the defendants were wholly responsible for the injury which they caused by illegal means. No counsel could change the facts. The one trial counsel for the two parties was as prepared as anyone could have been. Melrod's claim apparently, however, is not that they were unprepared to meet the allegations of the complaint as amended, but rather that they are now unprepared to pay the sum of money for which they

have been held liable. Clearly this is not grounds for a new trial.

### B. *The Melrod firm's claims.*

The Melrod firm presents a multitude of arguments in favor of reversal of this judgment. The firm argues that the trial itself was rendered unfair by the district court's premature assessment of Gorelick's credibility (as demonstrated by the robing room incident) and the court's excessive intervention during trial. The Melrod firm also contends that the court's perjury finding, by itself, was both legally and factually erroneous. Finally, the Melrod firm contends that the court's actions in holding it jointly and severally liable *sua sponte* violated the Federal Rules of Civil Procedure as well as due process.

The Melrod firm is not alone in challenging the fraud judgment. Dominion, joined by the Melrod firm, contends that, on the merits, the $128.7 million judgment cannot be sustained under a fraud theory.

### C. *Non-existence of fraud.*

■ Penthouse's fraud cause of action was set forth in Count III of its complaint. In that count, after realleging the facts surrounding the alleged anticipatory breach, Penthouse alleged the following: 1) On February 10, 1984, Dominion through the Melrod firm represented to Penthouse that Dominion was prepared to proceed with the loan closing according to the terms of the loan commitment, 2) the February 10, 1984 representation was false because Dominion did not intend to proceed with the loan unless Penthouse would agree to numerous additional conditions and terms that were not contained in the commitment, 3) in reliance on that representation, Penthouse entered into an agreement on February 10, 1984 to pay Dominion's costs and legal fees, and 4) Penthouse suffered damages in excess of $1 million in addition to the nearly $32,000 paid for Dominion's legal fees. Thus, Penthouse's fraud theory was that, on February 10, 1984, the Melrod firm falsely represented to Penthouse that Dominion would proceed with its agreement to participate according

to the terms of the loan commitment at a time when it in fact did not intend to proceed. In other words, Penthouse alleged that by February 10th Dominion no longer intended to fulfill its agreement to participate unless the commitment was restructured. Accordingly, Penthouse's position was that when Gorelick made statements on February 9–10, 1984 to the effect that Dominion intended to proceed, he committed a fraud for which his firm was liable.

The district court did not make factual findings in connection with Penthouse's fraud claim. Instead, it made its decision to hold the Melrod firm jointly and severally liable *sua sponte* and stated that the firm's actions constituted "active fraud." Thus, the court failed to make specific findings on each element of the fraud cause of action, i.e., that the Melrod firm—through Gorelick—knowingly made a false representation of present or past material fact with the intent to cause actual reliance and that Penthouse in fact relied on the misrepresentation to its detriment. The district court did, however, find that Gorelick attended the February 9th meeting for the sole purpose of sabotaging the deal and that Dominion did not intend on fulfilling its commitment at that time. Thus, if we assume that, on February 10th, Gorelick made the representations Penthouse claims, then, arguably, he would have made a false representation of Dominion's present intent which could give rise to a claim for fraud. At the bottom of the fraud claim, then, is the district court's determination that, by February 9th, Dominion did not intend on fulfilling its contractual obligation and that it had hired Gorelick to break up the deal. Dominion contends that this finding is clearly erroneous. We agree.

In its opinion, the district court labored to develop a factual basis supporting its conclusion that Gorelick was called in by Dominion to "sabotage" the transaction. To find that by February 9th Dominion had decided to breach its commitment, the court relied on no testimonial evidence. Rather, the district court turned to a document offered in evidence and observed that "on its Commitment Participation Report for

February, Dominion dropped Penthouse as a listed borrower." 665 F.Supp. at 306. The court then concluded that this was "almost conclusive proof that Dominion's officers had decided to breach its commitment by that time." *Id.* The district court did not recognize, however, that that report was not prepared in early-February, but was dated February 29th. Nor did the court take into account Dominion's Secondary Market Department's weekly list of loan commitments—also put into evidence—which indicated that Dominion carried the Penthouse participation on that list for every week through early-April 1984.

In addition to the unexplained omission of the Penthouse loan from Dominion's monthly report, the district court relied on Community's allegedly tenuous status when it found that Dominion intended to breach its commitment. The district court found that, by early-February, "Dominion should have been aware of Community's tenuous status as a loan participant." 665 F.Supp. at 306. Later, the court determined that, "[b]ecause of Community's withdrawal on February 29, Dominion was in the awkward position of having committed itself to lend more than the amount it was legally permitted to lend.... Thus, Dominion either had to stall the closing until the loan expired and then withdraw from its commitment, or breach its commitment." *Id.* at 310.

The district court's factual findings belie its conclusion that Dominion intended not to proceed on February 9th. According to the court's reasoning, Dominion was not in this "awkward position" until late-February—when it allegedly dropped the Penthouse loan off the monthly report and purportedly received Community's withdrawal. Thus, even if we were to accept the court's findings regarding Community's withdrawal and the inferences to be drawn from the omission on the report, we would be compelled to conclude that the court clearly erred when it determined that this evidence established that Dominion intended not to proceed on February 9th.

Nevertheless, we also reject the court's finding regarding the timing of Community's withdrawal. Although Wienke had ex-

pressed his reservations about the transaction to Dominion and Queen City on February 8th and then to Gorelick and Myerson in late February, there is no evidence of Community's withdrawal prior to its March 20th letter. Thus, we conclude that the court clearly erred in this regard also.

Aside from the district court's erroneous factual findings, there is no other evidence establishing that Dominion intended not to proceed and there is abundant evidence to indicate just the opposite. Even after the commitment expired, Dominion indicated its continued interest in the transaction and maintained steady contact with Penthouse. And, it was Penthouse, not Dominion, who cut off communications. Thus, we conclude that there is no basis to conclude that Gorelick or Dominion harbored a secret intent not to proceed on February 9–10 or otherwise. It therefore follows that, even assuming that Gorelick made a representation to Penthouse of Dominion's intent to proceed on February 10th, that representation of fact cannot give rise to a claim for fraud. Accordingly, the judgment entered against the Melrod firm is reversed.

Having concluded that Penthouse does not prevail on the merits of the fraud claim, it is unnecessary to pass on the several other arguments raised on this appeal. Nevertheless, we are quite concerned by the district court's conduct during the robing room incident as well as by its perjury finding. Suffice it to say that we believe that *ex parte* communications between the district court and only one of the litigants are rarely, if ever, looked upon with favor, even if intended to impart advice to a fellow member of the profession. With regard to the perjury finding, we are somewhat surprised by its presence in the court's decision. If the court viewed Gorelick's testimony as incredible, that is its prerogative as the trier of fact in a nonjury case, but unless perjury is at issue in a case, such a finding is not necessary once the trier of fact finds the witnesses' testimony incredible. The perjury finding here, however, was not only unnecessary but also was erroneous since it was not based upon clear and convincing proof. *See Barr Rubber Products Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir.), *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). Accordingly, we specifically reverse that finding.

CONCLUSION

In view of the foregoing, we reverse the judgments entered against Dominion and the Melrod firm in favor of Penthouse and against Dominion in favor of Queen City, affirm the dismissal of Dominion's cross-claim, and remand to the district court for the purpose of entering judgment in favor of Dominion and the Melrod firm and against Penthouse and Queen City dismissing the complaint and the related cross-action.